54 So.2d 555

**CITY OF BIRMINGHAM v. I. E. MORRIS & ASSOCIATES.**

**6 Div. 198.**

Supreme Court of Alabama.

Oct. 18, 1951.

274

Geo. S. Brown and Crampton Harris, Birmingham, for appellees.

Wm. L. Clark, Birmingham, for appellant.

BROWN, Justice.

The appellee sued the appellant in assumpsit for breach of a contract entered into by the plaintiff and the defendant. The trial resulted in a verdict in favor of the plaintiff for $2500.00 upon which the judgment appealed from was rendered.

The original complaint is in special assumpsit and alleges that plaintiff claimed

of the defendant $14,000.00 as damages for the breach of a contract entered into by the parties on the 10th of May, 1946, a copy of which is attached to the complaint as Exhibit A and made a part thereof. The complaint as last amended alleges:

"Under the terms of said contract the plaintiffs agreed to furnish and perform professional services as engineers and architects in connection with remodeling, renovating and mechanically bringing up to date the City Market Building at 23rd Street and 3rd Avenue, North, in the City of Birmingham, Alabama, and also agreed to supervise the general, structural, mechanical and architectural work to be done in that connection. The contract provided for a lump sum fee of Twenty-One Thousand ($21,000.00) Dollars, which said fee represented 6% of Three Hundred Fifty Thousand ($350,000.00) Dollars—the estimated cost of the work to be done under said contract, to be paid by the defendant to plaintiffs, and said sum has already been so paid.

"The contract made reference to a printed pamphlet which was attached to the said contract and made a part thereof and is incorporated as a part of Exhibit 'A', hereto attached. The applicable provisions of said pamphlet [and the contract as an entirety] were mutually accepted by the parties to said contract. Under the applicable provisions of said pamphlet, the aforesaid lump sum fee of Twenty-One Thousand ($21,000.00) Dollars would be the total compensation of the plaintiffs only if all the work under said contract was let by the defendant under a single general contract [or the customary major contracts] and that if the defendant should determine to have other portions of the work executed under separate contracts, thereby increasing the plaintiff's burden of service, expense, and responsibility, then the plaintiff's fee should be increased by 4% of the estimated cost of the said work on said building for said work let under separate contracts.

"And plaintiffs further allege that, thereafter, invitations for bids were issued by the defendant calling for all the work to be done under a single general contract. Bids were received by the defendant and were opened on, to-wit: June 18, 1946. Said bids were all rejected by the defendant. Thereafter, the defendant entered into separate and several contracts [which were not the customary major contracts] with the following contractors in execution of the project: J. F. Holley; The Carrier Corporation; Shook & Fletcher Supply Company; Badham Insulation Company; Bagby Elevator Company, Air Engineers; and The Marley Company, Inc. Plaintiffs allege that the said letting of the said separate contracts placed a considerable additional burden of service upon them and added to their expenses and responsibilities. [Plaintiffs allege that at the time of the execution of the aforesaid contract it was the intention of the parties that the defendant would let the work under a single general contract and it was upon said intention that the aforesaid lump sum fee of $21,000.00 was fixed but that the defendant thereafter abandoned said intention, thereby bringing into play the provisions of the said contract calling for an additional fee of four per cent. (4%). of the estimated cost of said work on said building for work let under separate contracts.]

"Plaintiffs further allege that they have fully performed all their obligations under said contract and have fully complied with all of the provisions of said contract on their part and the defendant has failed and refused to pay them the said additional 4% of the said estimated cost of Three Hundred Fifty Thousand ($350,000.00) Dollars, which is due them under the terms of said contract.

"And the plaintiffs further allege that under the provisions of Title 62, Section 657, of the Code of Alabama, 1940, they filed a statement of claim for the said Fourteen Thousand ($14,000.00) Dollars due under the terms of said contract, with the City Clerk of the defendant, on, to-wit: the 22nd day of June, 1948, and more than ten days before the filing of this suit, and that since that time they have heard nothing from the defendant." (The amendments to the complaint set out in the foregoing are surrounded by brackets.)

Exhibit A made a part of the above complaint is in the following words:

"This Agreement made the 10th (tenth) day of May in the year 1946 by and between

the City of Birmingham, Alabama, hereinafter called the owner, and I. E. Morris & Associates (the principals) Long & Paceley—Architects (Associated), hereinafter called the Engineers & Architects,

"Whereas, the owner intends to remodel, renovate & mechanically bring up to date the following premises, viz.: The City Market Building, located at 3rd Avenue & 23rd Street, and whereas the Owner has employed the Engineers & Architects to render professional services in connection with said proposed project; and whereas both parties hereto have mutually accepted the Applicable provisions of the printed 'Statement of Services to be rendered', a copy of which is hereto attached and made part of this agreement; Now Therefore, in consideration of the payment of fees hereinafter provided to be paid by the Owner, the engineers & architects agree to furnish and perform professional services in connection with said proposed project, for the general, structural, mechanical and architectural work, including supervision thereof.

"Lump Sum Fee: The owner agrees to pay the Engineers & Architects (payable to the principals—I. E. Morris & Associates) for the above mentioned services the fee of $21,000.00 (Twenty-One Thousand Dollars) subject to the payment schedules and adjustments as stated below:

"Payment Schedule: Upon completion of the final preliminaries, drawings, estimates furnished, outline specifications; ready to proceed with final working drawings specifications for bid taking 40% (Forty percent) of the lump sum fee is due.

"Upon completion of the working drawings, specifications, bid documents, taking of bids—ready to execute contract for construction—an additional 40% (Forty percent) of the lump sum fee is due.

> "I. E. Morris & Associates
> Engineers and Consultants
> Title Guarantee Building
> Phone 3–2267
> Birmingham 3, Alabama

"Balance of fee, 20% (Twenty percent) is due monthly on a basis of percent construction work completed.'

"Special Considerations: Due to the nature of the project, if the owner has to abandon the project as a whole, the owner agrees to inform the Engineers & Architects in writing. The Engineers & Architects will thereupon terminate the work as of such date, establish the percent total work completed, and render statement covering the completed portion of the work.

> "City of Birmingham
> By /s/ Cooper Green
> President of Commission
> (owner)

> "I. E. Morris & Associates
> Engineers and Consultants
> Title Guarantee Bldg.
> Birmingham 3, Alabama
> /s/ Henry H. Schroeder * * *."

Attached to said complaint under the reference therein as to the "Statement of services to be Rendered" is a blue pamphlet in book form of nine double column pages containing, among other things, an outline of the ethics of the profession of building architects and engineers and a schedule of proper minimum charges for such services complying with fair practices as a guide for negotiating contracts for service and building operations.

The defendant interposed demurrer to the original complaint as last amended which the parties refer to in brief as Count 1. The demurrer as amended was overruled. We are of opinion that a number of the grounds were well taken and that the court erred in overruling the demurrer. It is familiar law that the interpretation of written contracts is a question of law for the court. It is well settled that:

"Contracts must be interpreted in the light of the facts surrounding the parties when they were made. There cannot be a departure from the words of a written contract, they must have their full import and force. But to arrive at the true sense in which the parties employed them, courts of necessity consider the occasion which gave rise to the contract, the relation of the parties, and the object to be accomplished. Pollard v. Maddox, 28 Ala. 321. As is said by Bishop: 'The parties speak in their contract from the fountain of their mutual

knowledge, and if we would properly interpret their words we must put ourselves exactly in their position, and know just what they mutually know, with neither addition or abatement.' Bish.Cont. § 370. It is only by the aid of parol evidence that courts can be certain what were the circumstances under which a contract was made, what was the relation of the parties, and what was within their mutual knowledge. * * *" McGhee v. Alexander, 104 Ala. 116, 120, 16 So. 148, 149.

This doctrine has been repeatedly reaffirmed, most recently in the case of Ingalls Iron Works Co. v. Ingalls, Ala.Sup., 53 So.2d 847, 849, in which we observed: "'Recitals in a contract should be reconciled with the operative clauses, and given effect, so far as possible; but where the recital is so inconsistent with the covenant or promise that they cannot be harmonized, the latter, if unambiguous, prevails.'"

The complaint as last amended alleges "That at the time of execution of the aforesaid contract it was the intention of the parties that the defendant would let the work under a single general contract and it was upon said intention that the aforementioned lump sum fee of $21,000.00 was fixed, but that the defendant thereafter abandoned said intention, thereby bringing into play the provisions of the said contract calling for an additional fee of 4% (four per cent) of the estimated cost of said work on said building for work let under separate contract." This allegation, with others of like import, is the sole basis of the plaintiffs' claim that they are due to be paid $14,000.00 on the estimated cost of the work and these allegations, the heart of the complaint, are conclusions of the pleader. There is nothing in the original contract signed by the parties which we have heretofore set out, that restricted in any way the right of the owner (the defendant) to let the work under one or more contracts. The operative provisions in the typewritten contract are clear and unambiguous. The statements in the blue pamphlet embodied in the complaint, which on its face purports to be a mere guide for architects and engineers in formulating their contracts and fixing the compensation for services, are inconsistent and ambiguous and are not applicable to the lump sum contract sued on. Paragraph III of said pamphlet prescribes the four customary methods of (fixing) compensation, as follows: "1. *By a Percentage:* * * * 2. *By a Fixed Fee:* * * * 3. *By Lump Sum:* Under this method the lump sum fee is determined from the 'Schedule of Minimum Basic Rates' as applied to a lump sum and shall Not be subject to change because of variations, either upwards or downwards, between the actual cost of construction and estimate cost:

"(a) The Lump Sum Fee shall be fixed Only on a definitely established scope of the work: (4) *By Per Diem Rate:* * *."

The complaint adopts and is based on paragraph *V. Special Services* which states: "The 'Schedule of Minimum Basic Rates' applies when all construction work is let under the contract or the customary major contracts. Should the Owner determine to have other portions of the work executed under separate contracts, thereby increasing the Architect's burden of service, expense, and responsibility, the Architect is entitled to an increase of the applicable basic rate on the cost of such portion of the work as described under Article VII. Furthermore the minimum basic rates do not apply to any aggregate cost of one or more structures located on a single site and not executed under a single Architect's contract. However, structures when designed under a single Architect's contract and the major portion of the Architect's services are performed during a single period of time, the rates as set forth in the schedule shall apply. * * *"

Paragraph VII dealing with *Cost of the Work* referred to in the above quoted paragraph V states:

"Ordinarily to be interpreted as meaning the total of the contract sums incurred for the execution of the work not including Architect's and Engineer's fees, but in certain rare cases, e. g., when labor or materials are furnished by the Owner below its market cost or when old materials are reused, the cost of the work is to be interpreted as the cost of all materials and labor necessary to complete the work, as

such cost would have been if all materials had been new and if all labor had been fully paid at market prices current when the work was ordered, plus contractor's profits and expenses.

"The Architect should explain the conditional character of estimates made before final drawings and specifications are complete and should not make careless statements in misleading a client as to the probable cost of a building. Under no circumstances should an Architect guarantee any estimates or costs of the work."

And in argument of appellee it is insisted that the statement in paragraph VIII, which contains a table of percentage rates and the further statement that the "above rates are based upon all the work being let under a single General Contract," and "For any portion of the work let under a separate contract, the rate shall be 4% greater," applies to the present case.

Grounds of demurrer 6, 11, 12, 14, 16, 16-A, 16-C, 16-D, 16-F, 16-G, 16-H, 16-K, 16-I, 16-O, 16-P, 16-Q, 16-R, 16-S, 16-T, 20 and 21 take the point that said averments based on the excerpts from the "Blue Book" are conclusions of the pleader. The clear purpose and legal effect of said pleaded conclusions was to effect a departure from the words of the written contract and destroy its full import and force, not justified by the reference in the "Statement of Services to be Rendered", and to alter the provisions of the contract in a material part thereof, which is not permissible under the rule of interpretation stated in the authorities cited.

■ The legal operation and effect of the instrument pleaded does not depend upon collateral facts *in pais and extrinsic evidence*. The authorities cited by appellee, Boykin v. Bank of Mobile, 72 Ala. 262, 47 Am.Rep. 408, Weir v. Long, 145 Ala. 328, 39 So. 974, and Lutz v. Van Heynigen Brokerage Co., 199 Ala. 620, 624, 75 So. 284, are inapt as authorities to the situation presented in this case. In each of those cases there was ambiguity in the contract itself. In the first cited case there was an omission of the date on which the note sued on was to be paid. In the case of Weir v.

Long there was uncertainty in the dealings between the parties as to whether the goods purchased or ordered were on consignment or a purchase outright, and the court observed: " 'If there be ambiguity in the contract, resort may be had to the situation of the parties and the circumstances under which it was entered into, for the purpose, not of changing the writing, but of furnishing the light by which to ascertain its actual significance.' " 145 Ala. at page 331, 39 So. at page 975. The question in the Lutz case turned upon the authority of the agent who entered into the contract for the defendant, whether he was acting without authority and whether or not he alone was liable in the action. The contract in that case was signed by the agent and not by the principal, "rais[ing] such doubt as to whether it imported obligations assumed by the agent individually," or bound the principal. No such uncertainty exists with respect to the contract sued on in this case.

The plaintiffs further amended the complaint by adding Count 2, claiming "Fourteen Thousand ($14,000.00) Dollars for work and labor done for the defendant by the plaintiffs between May 10, 1946 at its request, which sum of money with the interest thereon is still due and unpaid."

After demurrer overruled to the complaint the defendant "pleaded in short by consent the general issue, with leave to give in evidence any matter which if well pleaded, would be admissible in defense of the action, to have effect as if so pleaded," with leave to the plaintiffs to reply.

The evidence is without dispute that the fee as fixed by the contract is a lump sum fee negotiated by the parties and that the table of percentages in paragraph VIII are not applicable. The witnesses Schroeder, acting for the plaintiffs, and the City of Birmingham acting through its commissioners, Messrs. Green and Morgan, show that Schroeder first proposed to do the work of drawing the necessary plans and supervising the entire work for a fee of $28,500. He was advised by Commissioner Green that he could not accept that proposition and stated that the building would be renovated and brought up to date or that he contemplated having it renovated and

brought up to date out of the general funds of the City and the funds on hand and anticipated were inadequate for paying such price; that the City had never paid more than six percent on such professional services and rejected the proposition first proposed. Thereupon the parties agreed on a lump sum total fee of $21,000, as stated in the contract, and payable as the contract provides. This proposition was accepted and the plaintiffs proceeded with the work of preparing the plans and after they had been completed up to from 50 to 75% of the work, this contract was drawn by Mr. Schroeder, as representing the plaintiffs. During the negotiations the pamphlet referred to as the "Blue Book" was not exhibited to Mr. Green or to Mr. Morgan, his associate; but when the contract was presented for the signature of the City after a lapse of time from February to May 10th, the pamphlet was attached to it and the only reference made to the pamphlet is what is stated in the contract itself, towit: "'Both parties hereto have mutually accepted the applicable provisions of the printed 'Statement of Services to be Rendered,' a copy of which is hereto attached and made a part of this agreement." Nothing was said at that time about how the work was to be let, whether by a single contract or a number of contracts. The evidence is also without dispute that all of the work performed by the plaintiffs, including the supervision, was performed under the contract of May 10, 1946. The plaintiffs thereupon presented to the owner, the City of Birmingham, a statement in words as follows, omitting the caption, etc.: "For professional service rendered as per agreement dated May 10, plans, specifications, supervision for Social Security Building, formerly City Market Building, total fee, $21,000.00. Payment received to date, $20,400.00. Supervision balance, $600.00. Amount due equal one-seventh of the provision Item of $4,200.00, $600.00."

The evidence further shows that this amount was paid in full. The complaint on its face so alleges. There is nothing in the evidence going to show in what manner the contract was to be let, whether to one or more contractors to do the work and make the repairs. It does appear that invitations were issued to several contractors inviting bids on the work. The appellant, after receiving these bids, rejected them all because they were more than the City desired to pay. Thereafter contracts were negotiated, letting the major part of the work to one contractor, who let some of the work to subcontractors, and other contracts were entered into with respect to other parts of the job.

This was all known to the plaintiffs before they presented their final bill for payment and accepted checks therefor and nothing was said at that time about any balance being due or any complaint made about how the contracts were let. The evidence shows that the cost of the work exceeded the estimated cost made by the plaintiffs in negotiating their fee of $21,000.00; that there were some delays incurred in part of the work on account of a scarcity of material; some negotiated changes in the contracts with the builder; and some changes made in the plans of the building. But no claim was made on these accounts until shortly before the suit was filed in this case. It is clear that the reference to the "Blue Book" was for a limited purpose, "Statement of Services to be Rendered," and not for the purpose of altering or changing the contract signed by the parties as to the lump sum fee nor the manner in which the owner was to let the contract. Therefore it became a part of the contract for the limited purpose only. Hancock v. Oliver, 228 Ala. 548, 551, 154 So. 571, 572, 573.

In the last cited case it was observed: "It is clear the reference to the Mobile county contract with Hancock Company was for a limited purpose only; that is, as to the construction of the bridge which was sublet to the Bay Construction Company, and that contract therefore became a part of this for such limited purpose only. 13 C.J. 530." See also Crawford v. E. C. Payne Lumber Co., 17 Ala.App. 194, 84 So. 564.

"The intention of the parties is to be deduced from the language employed by them, and the terms of the contract, where unambiguous, are conclusive, and the rule

making the terms of the contract conclusive where unambiguous is controlling in the absence of averment and proof of mistake, the question being, not what intention may have existed in the minds of the parties, but what intention is expressed by the language used." 17 C.J.S., Contracts, § 296, page 695. To the same effect is Lee v. Cochran, 157 Ala. 311, 47 So. 581. To the same effect also is Guerini Stone Co. v. P. J. Carlin Construction Co., 240 U.S. 264, 36 S.Ct. 300, 60 L.Ed. 636, 642.

We are therefore at the conclusion that the defendant was due the affirmative charge which it requested in writing in several forms, and that the court erred in refusing said charge.

Reversed and remanded.

LIVINGSTON, C. J., and LAWSON and STAKELY, JJ., concur.