226 F.3d 15 (1st Cir. 2000)
 THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, ET AL., PETITIONERS, APPELLANTS,
V.
MAUREEN A. KIRSCHHOFER, RESPONDENT, APPELLEE.
THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, ET AL.,
PETITIONERS, APPELLANTS,
V.
WILLIAM E. HUDSON, RESPONDENT, APPELLEE.
THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, ET AL.,
PETITIONERS, APPELLANTS,
V.
A. BRUCE KUNKEL, JR., RESPONDENT, APPELLEE.
THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, ET AL.,
PETITIONERS, APPELLANTS,
V.
DENNIS R. LINDHOLM, RESPONDENT, APPELLEE.
THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, ET AL.,
PETITIONERS, APPELLANTS,
V.
CHRISTOPHER R. HERCHOLD, RESPONDENT, APPELLEE.
THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, ET AL.,
PETITIONERS, APPELLANTS,
V.
ROBERT A. HANSON,RESPONDENT, APPELLEE.
THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, ET AL.,
PETITIONERS, APPELLANTS,
V.
DOUGLAS W. RODWELL, JR., RESPONDENT, APPELLEE.
THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, ET AL., PETITIONERS, APPELLANTS,
V.
DAVID S. NELSON, RESPONDENT, APPELLEE.
THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, ET AL.,
PETITIONERS, APPELLANTS,
V.
DOMINIC W. DINUNZIO, RESPONDENT, APPELLEE.
THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, ET AL.,
PETITIONERS, APPELLANTS,
V.
H.C. TIDWELL, JR., RESPONDENT, APPELLEE.
THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, ET AL.,
PETITIONERS, APPELLANTS,
V.
DOUGLAS THOMAS, RESPONDENT, APPELLEE.
THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, ET AL.,
PETITIONERS, APPELLANTS,
V.
W. RONALD ANDERSON, RESPONDENT, APPELLEE.
THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, ET AL.,
PETITIONERS, APPELLANTS,
V.
KEVIN J. CARR, RESPONDENT, APPELLEE.
THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, ET AL.,
PETITIONERS, APPELLANTS,
V.
PAUL R. ZIETLOW, RESPONDENT, APPELLEE.
THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, ET AL.,
PETITIONERS, APPELLANTS,
V.
JAMES E. SAMUEL,RESPONDENT, APPELLEE.
THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, ET AL.,
PETITIONERS, APPELLANTS,
V.
STANLEY L. COMPTON, RESPONDENT, APPELLEE.
THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY, ET AL.,
PETITIONERS, APPELLANTS,
V.
MICHAEL J. KELLEY, RESPONDENT, APPELLEE.
 No. 99-2246, No. 99-2247, No. 99-2248, No. 00-1019, No. 00-1020, No. 00-1021, No. 00-1022, No. 00-1023, No. 00-1024, No. 00-1025, No. 00-1026, No. 00-1027, No. 00-1028, No. 00-1029, No. 00-1030, No. 00-1200, No. 00-1201
 United States Court of Appeals For the First Circuit
 Heard August 1, 2000
Decided September 13, 2000
 
 APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS. Hon. Nathaniel M. Gorton, U.S. District Judge.
 Patrick W. Shea, with whom Adam S. Bozek, Paul, Hastings, Janofsky & Walker Llp, Joseph M. Hamilton, and Mirick, O'Connell, DeMallie & Lougee were on brief, for appellants.
 Glen DeValerio, with whom James R. Hubbard, Ricci, Hubbard, Leopold, Frankel & Farmer, PC, Michael G. Lange, Alicia Duff, and Berman, DeValerio & Pease Llp were on brief, for appellees.
 Before Selya and Lipez, Circuit Judges, and Casellas,* District Judge.
 Selya, Circuit Judge.
 
 
 1
 These appeals emanate from the district court's denial of seventeen petitions to compel arbitration. The petitioners contend, as they did below, that the rules and regulations of the National Association of Securities Dealers (NASD) grant them a right to arbitrate the claims that the respondents have asserted against them in parallel state court litigation. Discerning no error in the district court's contrary conclusion, we affirm the denial of arbitration.
 
 I. BACKGROUND
 
 2
 The petitioners, defendants in the underlying state court actions and appellants here, comprise an intricate corporate hierarchy. The Paul Revere Variable Annuity Insurance Company (Variable) and The Paul Revere Protective Life Insurance Company (Protective) are wholly-owned subsidiaries of The Paul Revere Life Insurance Company (Revere Life). Revere Life is, in turn, a wholly-owned subsidiary of The Paul Revere Corporation (PR Corp.). These four Massachusetts corporations share a principal place of business in Worcester. For many years, they competed with Provident Life & Accident Insurance Company (PL&A), a Tennessee corporation. PL&A is a wholly-owned subsidiary of a Delaware corporation, Provident Companies, Inc., and both are headquartered in Tennessee.[1] On March 27, 1997, Provident acquired PR Corp. (and, thus, gained effective control of all the other Paul Revere companies).
 
 
 3
 Seventeen individuals who labored deep within the corporate web learned of this transaction with considerable trepidation. Scattered throughout the country, each held the position of General Manager-Career pursuant to an employment agreement with Variable, Protective, and Revere Life.[2] Alleging that the acquirer made it abundantly clear that they would be terminated after the acquisition was completed, the seventeen filed separate, but substantially similar, breach-of-contract actions in Worcester Superior Court against all six of the corporate entities identified above.[3]
 
 
 4
 As a condition of his or her employment, each manager had been required to register with NASD and to promise to abide by NASD's rules and regulations (as from time to time amended). At the time the managers sued, the NASD Code mandated arbitration of certain disputes if requested by an NASD member or a person associated with a member. Invoking this mandate and citing the Federal Arbitration Act (FAA), 9 U.S.C. § 3, the petitioners asked the state court to stay its hand or to dismiss the managers' complaints pending arbitration. The managers objected to these motions and voluntarily dismissed their actions against Variable (the only petitioner that was an NASD member).[4]
 
 
 5
 The petitioners attempted to parry this thrust by shifting venues. Because none of the respondents was a citizen of Massachusetts, Tennessee, or Delaware, diversity jurisdiction existed. See 28 U.S.C. § 1332(a). Seizing on this fortuity, the petitioners again invoked the FAA and asked the federal district court to compel arbitration. The district court denied these entreaties on the ground that the petitioners lacked standing under NASD's arbitration protocol. See Paul Revere Variable Annuity Ins. Co. v. Thomas, 66 F. Supp. 2d 217, 223-28 (D. Mass. 1999). The petitioners seek review of this ruling. See 9 U.S.C. § 16.
 
 II. ANALYSIS
 
 6
 For organizational purposes, we divide our analysis into two segments, first discussing the rights of those petitioners who are not NASD members, and thereafter addressing the situation vis-aa-vis Variable. Because abstract questions as to whether particular disputes do (or do not) come within the four corners of an expressly limited arbitration provision are legal in nature, we afford de novo review. See KKW Enters. v. Gloria Jean's Gourmet Coffees Franchising Corp., 184 F.3d 42, 48 (1st Cir. 1999); PaineWebber, Inc. v. Elahi, 87 F.3d 589, 592 (1st Cir. 1996); cf. New Hampshire Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 12 (1st Cir. 1996) (applying de novo standard of review to decisions anent standing). Throughout the opinion, we remain cognizant that, as a matter of federal policy, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983).
 
 
 7
 A. The Non-Member Corporations.
 
 
 8
 An NASD registrant is obligated to comply with the rules of the organization that are in effect at the time she files suit. See Seus v. John Nuveen & Co., 146 F.3d 175, 187 (3d Cir. 1998), cert. denied, 525 U.S. 1139 (1999). Since fifteen of the seventeen managers sued on October 8, 1997, we refer, for purposes of this discussion, to the NASD rules as they existed on that date.[5]
 
 
 9
 NASD Rule 10201 limns the types of matters eligible for arbitration under the NASD Code. Rule 10201(a) carves out the subset of eligible matters for which arbitration is required:
 
 
 10
 Any dispute, claim, or controversy eligible for submission . . . between or among members and/or associated persons, and/or certain others, arising in connection with the business of such member(s) or in connection with the activities of such associated person(s), or arising out of the employment or termination of employment of such associated person(s) with such member, shall be arbitrated under this Code, at the instance of:
 
 
 11
 (1) a member against another member
 
 
 12
 (2) a member against a person associated with a member or a person associated with a member against a member; and
 
 
 13
 (3) a person associated with a member against a person associated with a member.
 
 
 14
 The respondents do not dispute that their claims would be subject to this provision if one or more of the petitioners had a right to invoke it. Leaving Variable to one side, however, the other petitioners are not NASD members. Accordingly, subsections (a)(1) and (a)(2) do not pertain, and the non-members can insist upon arbitration only if one or more of them qualifies as "a person associated with a member."
 
 
 15
 This brings us to Article I of the NASD by-laws, which at the relevant time provided that:
 
 
 16
 When used in these By-Laws, and any rules of the [NASD], unless context otherwise requires, the term . . . (q) "person associated with a member" or "associated person of a member" means every sole proprietor, partner, officer, director, or branch manager of any member, or any natural person occupying a similar status or performing similar functions, or any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by such member, whether or not any such person is registered or exempt from registration with the [NASD] pursuant to these By-Laws.[6]
 
 
 17
 We believe that the quoted definition, fairly read, signifies that only a natural person can be a "person associated with a member." Even though the first clause of the definition (which uses the adjective "every"), when viewed in isolation, might appear to speak more broadly, the litany that follows this adjective is functional, and virtually all of the functions are of a kind for which only natural persons are suited (e.g., "sole proprietor," "officer," "director," "branch manager"). In context, it makes sense to confine the theoretically broader term "partner" and the remainder of the list to natural persons. See Beecham v. United States, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). Accordingly, the fact that all the non-members are corporations disposes of their claim that they are entitled to require arbitration under the NASD by-laws.
 
 
 18
 An holistic view of the text reinforces this view. Every reference in the definition to "person" is modified either explicitly or implicitly by the adjective "natural." Moreover, the second clause of the definition picks up the residual category of "natural person[s]" serving in functionally equivalent roles. Despite the petitioners' importunings, we can conceive of no reason why an organization would adopt this sensible, functional approach to classifying natural persons while simultaneously adopting a wooden, formalistic approach with respect to other entities (and, in the bargain, opening the door to manipulative behavior). The way to avoid this anomaly is simply to read "every" to mean "every natural person," and thus to exclude all corporations, no matter how they might identify themselves.[7] Consequently, we concur with the Fifth Circuit that, "[r]ead in its entirety, the definition of associated person in the NASD by-laws seems calculated to exclude corporate entities . . . ." Tays v. Covenant Life Ins. Co., 964 F.2d 501, 503 (5th Cir. 1992) (per curiam); accord Burns v. New York Life Ins. Co., 202 F.3d 616, 620-21 (2d Cir. 2000); Gardner v. Benefits Communications Corp., 175 F.3d 155, 162 (D.C. Cir. 1999); Cantor Fitzgerald, L.P. v. Prebon Sec. (USA) Inc., 731 A.2d 823, 828-29 (Del. Ch. 1999). But see McMahan Sec. Co. L.P. v. Forum Capital Mkts. L.P., 35 F.3d 82, 87 (2d Cir. 1994).
 
 
 19
 The petitioners strive to persuade us that a different result should obtain. They note, first, that the NASD definition, by its terms, is applicable "unless context otherwise requires." Then, grasping that straw, they cite the Supreme Court's opinion in United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960) (directing that arbitration should be ordered "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute"), and attempt to wrap themselves in the statutory definition contained in the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a). To this end, they declare that here "the context clearly requires that the Exchange Act's definition of 'associated person' be used" because "using the definition found in the By-Laws would allow a party to evade an agreement to arbitrate, but using the Exchange Act's definition would result in arbitration." Petitioners' Brief at 37.
 
 
 20
 We find this argument unconvincing. The Exchange Act specifically defines the word "person" to mean "a natural person, company, government, or political subdivision, agency, or instrumentality of a government." 15 U.S.C. § 78c(a)(9). It then provides that:
 
 
 21
 The term "person associated with a member" or "associated person of a member" when used with respect to a member of a national securities exchange or registered securities association means any partner, officer, director, or branch manager of such member (or any person occupying a similar status or performing similar functions), any person directly or indirectly controlling, controlled by, or under common control with such member, or any employee of such member.
 
 
 22
 Id. § 78c(a)(21). Contrasting the NASD definition and the Exchange Act definition bolsters the view that the former applies only to natural persons. Unlike the Exchange Act, NASD's by-laws do not purpose to define the word "person," but repeat the qualifier "natural" throughout the definition of "associated person." We think that this shift in emphasis quite likely heralds NASD's intention to limit its definition to natural persons.[8] See Gardner, 175 F.3d at 162; Tays, 964 F.2d at 503.
 
 
 23
 If more were needed - and we doubt that it is - the apparent focus of this provision is internal rather than external. That is, in the absence of any specific reference to touchstones outside the NASD Code, there is not the slightest reason to believe that the drafters of the NASD Manual considered either the federal policy favoring arbitration or the Exchange Act to be part of the "context" relevant in deciding whether to adhere to the definition stated in the by-laws. Because it is much more plausible that the drafters intended to direct interpreters to the text, structure, and purpose of the NASD's various regulations and practices rather than to an endless (and ever-changing) array of outside factors, we reject the petitioners' asseveration. Cf. Rowland v. California Men's Colony, Unit II Men's Advisory Council, 506 U.S. 194, 199-200 (1993) (deciding that the word "context" in the Dictionary Act's phrase "unless the context indicates otherwise" meant the text of the statute surrounding the word at issue and did not point further afield).
 
 
 24
 In all events, the federal policy requiring that doubts be resolved in favor of arbitration has no traction here because nothing in the Exchange Act leads us to doubt our conclusion that only natural persons can be associated persons for purposes of Rule 10201. As the Second Circuit recently explained in the course of rejecting a similar argument,
 
 
 25
 the NASD's different definition does not result in any rule or practice that is inconsistent with the statute or any regulatory command of the SEC. Moreover, the SEC reviews and approves all NASD rules and by-laws before they become effective. We think it is safe to assume that the SEC would not have approved the NASD definition of "associated person" if, by construing the term as it does, the NASD exceeded its authority.
 
 
 26
 Burns, 202 F.3d at 621 (citations omitted). We employ a comparable mode of analysis here: the Exchange Act and the NASD Code serve very different purposes, so it is hardly surprising that they employ dissimilar definitions.[9]
 
 
 27
 For these reasons, we conclude that the five petitioners who are not themselves NASD members have no right, contractual or otherwise, to compel the respondents to arbitrate the claims asserted in the state court proceedings. To that extent, then, the district court appropriately denied relief.
 
 
 28
 B. The Member Corporation.
 
 
 29
 Variable is an NASD member and the respondents are all natural persons who, by reason of their employment, are "persons associated with a member" (i.e., Variable) within the meaning of Rule 10201. On this basis, Variable claims a contractual right to force arbitration of the respondents' claims. But there is a rub: the respondents have dismissed with prejudice all their claims against Variable. See supra note 4. Variable nonetheless presses for arbitration on the theory that it remains potentially liable as a co-obligor in respect to the respondents' employment agreements. See Restatement (Second) of Contracts § 289(1) (1981) ("Where two or more parties to a contract promise the same performance to the same promisee, each is bound for the whole performance thereof . . . ."). In its view, Protective and Revere Life would have equitable rights to contribution against it in the event they are adjudged liable to the respondents. See Restatement of Restitution § 81 (1937); Quintin v. Magnant, 189 N.E. 209, 209-10 (Mass. 1934).[10] Regardless of whether any effort would be made within the corporate family to enforce these rights, Variable argues that, as a regulated company within a publicly-held group, it would have to report, and reserve against, that potential liability. This possibility, Variable suggests, is sufficient to establish its standing.
 
 
 30
 Variable's conclusion depends, of course, on the accuracy of the premise that it, along with Protective and Revere Life, jointly promised a single performance. In determining whether the three co-signatories promised a unified performance or separate performances, we look to the manifested intention of the parties to the general manager agreements. See Restatement (Second) of Contracts § 288(1) (1981); Lovell v. Commonwealth Thread Co., 172 N.E. 77, 78 (Mass. 1930). The parties' intentions can be "revealed by the language of their contract and the subject matter to which it relates, as well as the surrounding circumstances, including the practical construction placed on the contract by the parties themselves, the interest of the parties, and the purposes sought to be accomplished at the time the contract was made." 12 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 36:2, at 614-15 (4th ed. 1999) (footnote omitted). For purposes of these appeals, we assume, favorably to the petitioners, that each respondent was employed pursuant to a single general manager agreement with all three companies. See supra note 2. Because no one has suggested that there are material differences among the seventeen agreements, we rely on one exemplar.
 
 Douglas Thomas's contract begins:
 
 31
 This Agreement, made and entered into this 1st day of May, 1993 by and between
 
 THE PAUL REVERE LIFE INSURANCE COMPANY
 
 32
 THE PAUL REVERE PROTECTIVE LIFE INSURANCE COMPANY
 
 
 33
 THE PAUL REVERE VARIABLE ANNUITY INSURANCE COMPANY
 
 
 34
 of Worcester, Massachusetts ("Paul Revere") and Douglas E. Thomas, CLU, RHU of Greensboro, North Carolina, the General Manager ("You", "Your").
 
 
 35
 Witnesseth: You are hereby appointed an active full-time General Manager-Career for each Paul Revere Company with whom You become properly licensed. . . .
 
 
 36
 [Underscored elements typed into standard form.]
 
 
 37
 The provisions defining the parties' contractual duties, with one exception, use the undifferentiated term "Paul Revere." The exception is paragraph seven, which provides that any compensation otherwise due under the agreement "may be first applied to repayment of any of Your charges, loans, advances or guarantees to the same or any other Paul Revere Company, or Paul Revere approved company, irrespective of whether or not such monies are payable by the company to which such indebtedness is owed." All three companies are listed again at the foot of the agreement, immediately above the signature of a single vice-president.
 
 
 38
 The petitioners point to the undifferentiated references to "Paul Revere" and the solitary signature as evidence that the general manager agreement imposes collective obligations on the three co-signatories. The respondents urge us to draw the opposite inference, highlighting the second sentence of the agreement (which appoints the individual a general manager for each company). The district court attached great significance to this provision, concluding that it "evinces an intention of the parties to enter into three separate agreements through one writing whereby each Paul Revere party [became] obligated to pay commissions only with respect to the insurance products issued by its company." 66 F. Supp. 2d at 227. In the context of the particular industry and the particular engagement, we agree that the obligations of the employing parties are separate and distinct, notwithstanding the undifferentiated references in the agreement to "Paul Revere."
 
 
 39
 Certain aspects of the general manager agreement assist us in reaching this conclusion. First, although Variable, Protective, and Revere Life are all listed at the beginning and end of the agreement, neither listing is explicitly conjunctive. If the parties had intended to bind the three companies together, it would have been child's play for the companies - which promulgated the standard forms - to add the word "and" between the second and the third corporate names. The drafters' failure to do so leaves open the possibility that the general references in the body of the agreement are to be read as disjunctive. Second, paragraph seven's withholding mechanism presumes that a general manager may have debts to one signatory company, yet be owed money by another. Such a situation would never arise if the three companies made a single promise of performance. The crucial duty to pay compensation must be company-specific, or paragraph seven, as worded, makes no sense. We are reluctant to drum that paragraph out of the agreement. See Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995) (noting that, for interpretive purposes, "[a]ccepted canons of construction forbid the balkanization of contracts").
 
 
 40
 Our confidence in this interpretation is buoyed by the nature of the engagement. Many of the companies' contractual obligations under the general manager agreement are triggered by the sale of particular products, yet Variable, Protective, and Revere Life offer markedly different product lines (e.g., only Variable legally can underwrite certain annuity products). Moreover, the business activities in which the companies engage are heavily regulated. It would be odd - and perhaps illegal under various federal and state insurance and securities laws - for one company to pay commissions on the sale of another company's products (products which it could not itself offer for sale). See, e.g., Mass. Gen. Laws ch. 175 §§ 9-11 (West 1998 & Supp. 2000) (providing for the calculation of minimum reserve levels that must be held by insurance companies and specifying that any debt or liability will be charged against the company); National Ass'n of Ins. Commissioners Model Laws, Regulations and Guidelines: Unfair Trade Practices Act § 4(B) (1993) (including as unfair trade practice making or causing to be made any assertion related to any insurer which is untrue, deceptive, or misleading). Indeed, the petitioners, who had the burden to show arbitrability, see McCarthy v. Azure, 22 F.3d 351, 354-55 (1st Cir. 1994), offered no evidence that the co-signatories paid each other's commissions, pooled net profits, or split all costs. Viewed against this backdrop, the undifferentiated references in the general manager agreement to "Paul Revere" do not suffice to overpower the basic structure of the transaction and the fundamental nature of the industries involved. See Colt v. Learned, 118 Mass. 380, 381 (1875) (holding that the structure of a transaction, standing alone, may be sufficient to convert an explicit promise by multiple parties jointly and severally to undertake a single performance into promises of separate performances); see also Restatement (Second) of Contracts § 288 cmt. c (1981) (suggesting that "[t]he fact that the interests of the promisors are different [or] that one receives all or most of the consideration" can signal an intent to promise separate performances).
 
 
 41
 Our conclusion that the standard general manager agreement imposes separate obligations on the three corporate co-signatories gets the grease from the goose. Because each respondent effectively entered into three separate contractual relationships, each respondent's claims against Protective and Revere Life - neither of which is a NASD member or associated person - are independent from his or her relationship with Variable (and, therefore, outside the scope of NASD Rule 10201). And for its part, Variable, having secured a dismissal with prejudice, faces no realistic risk of significant harm. Thus, Variable lacks standing to compel arbitration because it lacks a concrete interest in the state court proceedings. See Larson v. Valente, 456 U.S. 228, 238-39 (1982) (explaining that a party seeking to invoke a federal court's jurisdiction must have a "personal stake" in the outcome of the controversy); American Postal Workers Union v. Frank, 968 F.2d 1373, 1377 (1st Cir. 1992) (requiring "realistic risk" of future harm as a predicate for standing).
 
 
 42
 To what we already have said, the district court added that the petitioners had drafted the general manager agreements. It then cited the contra proferentem rule and held that any ambiguities in the agreements must be construed against petitioners. See 66 F. Supp. 2d at 227. The petitioners voice two objections to this approach. Their objections lack force.
 
 
 43
 The first of the petitioners' two objections is easily dispatched. They posit that contra proferentem is inapposite here because reading the general manager agreements to impose separate obligations actually benefits the companies by allowing them to escape liability for each others' debts. This asseveration is too clever by half. The applicability of contra proferentem depends on the parties' positions as they appear in the litigation sub judice. See Restatement (Second) of Contracts § 206 cmt. a (1981). While it is certainly possible that joint liability may be disadvantageous to the petitioners for some purposes, their theory of this case depends on a finding of joint liability. Thus, the petitioners' first objection founders.
 
 
 44
 The petitioners' second objection is that the court was required to resolve any doubts in favor of arbitration rather than against the drafters. This objection evinces a fundamental misconception of the principle upon which the petitioners rely.
 
 
 45
 The purpose of the FAA is "to make arbitration agreements as enforceable as other contracts, but not more so." Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 n.12 (1967). It follows inexorably from that statement that the principle of resolving doubts in favor of arbitration is "subject to constraints." Coady v. Ashcraft & Gerel, 223 F.3d 1, 9 (1st Cir. 2000). One important constraint is that the federal policy favoring arbitration does not totally displace ordinary rules of contract interpretation. Thus, numerous courts have employed the tenet of contra proferentem in construing ambiguities in arbitration agreements against the drafters. See, e.g., Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62-63 (1995); Security Watch, Inc. v. Sentinel Sys., Inc., 176 F.3d 369, 374 (6th Cir. 1999), cert. denied, 120 S. Ct. 1220 (2000). We think that this is a proper use of contra proferentem.
 
 
 46
 The petitioners disagree. While they concede that the contra proferentem tenet properly applies to such questions as whether a party has entered an arbitration agreement or whether an arbitration agreement is enforceable vel non, they nonetheless maintain that it has no application to questions touching upon the scope of an arbitration agreement.
 
 
 47
 It is true that, generally speaking, the presumption in favor of arbitration applies to the resolution of scope questions. See First Options v. Kaplan, 514 U.S. 938, 945 (1995); Moses H. Cone, 460 U.S. at 24-25; McCarthy, 22 F.3d at 355. That generality, however, does not profit the petitioners. A scope question arises "when the parties have a contract that provides for arbitration of some issues" and it is unclear whether a specific dispute falls within that contract. First Options, 514 U.S. at 945. In framing the issue of a party's standing to compel arbitration as a scope question, the petitioners distort the meaning of the term. Cf. McCarthy, 22 F.3d at 355 (observing that the federal policy favoring arbitration does not reach "situations in which the identity of the parties who have agreed to arbitrate is unclear"). Because the question of Variable's standing goes to whether Variable has a right to arbitrate at all vis-aa-vis the managers, that question is not a scope question. The federal preference for arbitration does not come into play and, a fortiori, it cannot undermine the lower court's reliance on the contra proferentem tenet.
 
 
 48
 This same reasoning defeats the petitioners' other attempts to invoke the federal policy favoring arbitration. That policy simply cannot be used to paper over a deficiency in Article III standing. See United States v. AVX Corp., 962 F.2d 108, 113 (1st Cir. 1992) ("Standing is a constitutional precondition to the jurisdiction of a federal court and may not be conferred by judicial fiat upon a party who does not meet the requirements of Article III."). The Supreme Court has described the primary purpose of the FAA as "ensuring that private arbitration agreements are enforced according to their terms." Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. Univ., 489 U.S. 468, 478 (1989). Enabling a party who has been dismissed with prejudice from a suit and who faces no readily foreseeable jeopardy to compel arbitration would not advance this policy. Perhaps more importantly, such a step would fly in the face of established standing doctrine. In the standing inquiry, "[a] mere interest in a situation--no matter how deeply felt, or how important the issue - will not substitute for actual injury." Frank, 968 F.2d at 1375.
 
 
 49
 We need go no further.[11] Concluding, as we do, that the petitioners (other than Variable) have no contractual right to demand arbitration under the NASD rules, and that Variable, which has such a right in the abstract, lacks standing to enforce it in the circumstances at hand, we uphold the district court's denial of all seventeen petitions to compel arbitration.
 
 
 50
 Affirmed.
 
 
 
 Notes:
 
 
 *
 Of the District of Puerto Rico, sitting by designation.
 
 
 [1]
 In 1999, Provident merged with Unum Corporation, forming UnumProvident. Because the events at issue antedated the merger, we refer to the company as Provident.
 
 
 [2]
 There is some dispute as to whether Variable and Protective were parties to the employment agreements of respondents James Samuel, Robert Hanson, and William Hudson. Because this discord does not affect the outcome here, we assume for argument's sake that these three individuals signed contracts that embraced Variable and Protective (as well as Revere Life).
 
 
 [3]
 Some of the seventeen respondents retired in anticipation of the seemingly inevitable denouement; the others stayed on the job and eventually were cashiered.
 
 
 [4]
 Although some of these dismissals were initially without prejudice, that stratagem has since been abandoned. At this point, the respondents have dismissed all their claims against Variable with prejudice.
 
 
 [5]
 The other two managers, Michael Kelley and Stanley Compton, brought suit on January 28, 1999. In the intervening period, the pertinent rule, NASD Rule 10201, was amended to exempt statutory employment discrimination claims from mandatory arbitration. See 63 Fed. Reg. 35,299 (1998). That amendment makes no difference here.
 
 
 [6]
 The reference to "any rules of the [NASD]" was deleted on January 15, 1998. See Approval Order, 62 Fed. Reg. 62,385 (1997); Notice of Proposed Rule Change, 62 Fed. Reg. 53,062, 53,076 (1997). Under some circumstances, this deletion might signal that the definitions contained in the by-laws no longer apply when interpreting the rules. Here, however, NASD Rule 0121 negates any such inference by expressly incorporating those definitions.
 
 
 [7]
 In point of fact, the definition of "person associated with a member" was amended on January 15, 1998, to omit the word "every," with no suggestion that this revision was meant to constrict the definition's pre-existing scope. See Approval Order, 62 Fed. Reg. 62,385 (1997); Notice of Proposed Rule Change, 62 Fed. Reg. 53,062, 53,064, 53,077 (1997). At the same time, NASD modified the definition to include "a natural person registered under the Rules of the Association." Notice of Proposed Rule Change, 62 Fed. Reg. 53,062, 53,077 (1997); see also Approval Order, 62 Fed. Reg. 62,385 (1997). These revisions further reinforce our belief that the NASD definition covers only natural persons.
 
 
 [8]
 To be sure, NASD Rule 0120(n) defines person to "include any natural person, partnership, corporation, association, or other legal entity." We do not believe that this general definition detracts from, or trumps, the more specific definition of "person associated with a member" contained in the by-laws. See Edmond v. United States, 520 U.S. 651, 657 (1997) ("Ordinarily, where a specific provision conflicts with a general one, the specific governs."); cf. United States v. Lara, 181 F.3d 183, 198 (1st Cir. 1999) ("Courts generally adhere to the principle . . . that more recent or specific statutes should prevail over older or more general ones.").
 
 
 [9]
 The petitioners lean heavily on Cular v. Metropolitan Life Ins. Co., 961 F. Supp. 550 (S.D.N.Y. 1997), in which the court held that a member's employee qualified as an associated person for purposes of NASD arbitration. To the extent that Cular rests on the presumption in favor of arbitration and the Exchange Act definition, see id. at 556-57, its reasoning is inconsistent with the Second Circuit's subsequent (and more closely analogous) decision in Burns, and we decline to follow it. Moreover, the Cular court relied upon an explicit reference to employment-related disputes later added to the NASD Code. See id. at 557. No comparable reference enhances the petitioners' attempt to include corporations as associated persons.
 
 
 [10]
 Because these appeals do not turn on choice of law, we take no view on this issue. We use case law from Massachusetts for illustrative purposes only.
 
 
 [11]
 Although we need not reach the question, there are indications that Variable, even on its reading of the general manager agreements, would not present a justiciable controversy. At best, the co-signatories' rights to contribution would be contingent upon a finding of liability and payment of more than their pro rata shares. See Restatement of Restitution § 81 (1937). Unless and until these events occur, a powerful argument can be made that Variable faces no direct and immediate harm. See Ernst & Young v. Depositors Econ. Protect. Corp., 45 F.3d 530, 538 (1st Cir. 1995) (finding unripe a declaratory judgment action where the plaintiff's asserted injury would materialize, if at all, only after a long string of contingencies, including a finding of fault, an order requiring overpayment, and an action seeking contribution).