**SENTINEL PRODUCTS CORP., Plaintiff,**

v.

**SCRIPTORIA, N.V., Defendant.**

No. Civ.A. 99–12386–PBS.

United States District Court, D. Massachusetts.

Nov. 30, 2000.

John A. Walsh, Thomas J. Wynn, Wynn & Wynn, Raynham, MA, for Plaintiff.

John J. Curtin, Bingham, Dana & Gould, Eunice E. Lee, Bingham Dana, LLP, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. Introduction

Plaintiff Sentinel Products Corp. ("Sentinel Products") is a Massachusetts-based company which seeks compensatory and punitive damages from Defendant Scriptoria, N.V. ("Scriptoria"), a Belgian company, for breach of contract. Defendant moves pursuant to 9 U.S.C. §§ 3 and 4 to compel arbitration as provided in paragraph 8.2 of the Share Purchase and Share Exchange Agreement (the "Agreement") between the parties which applies to "[a]ny dispute concerning the validity, the interpretation or the execution" of the agreement. Sentinel Products objects to the motion, arguing that its claim of failure of performance is outside of the scope of the agreement's arbitration clause.

After a hearing, the Court *ALLOWS* Defendant's Motion to Compel.

### II. Background

For purposes of this motion, the Court treats the following facts alleged in the complaint as true.

Plaintiff Sentinel Products is the successor in interest to P.I., Inc., another Massachusetts company. On September 24, 1987, P.I., Inc. (the seller) entered into a Share Purchase and Share Exchange Agreement with Scriptoria, N.V. (the buyer) for the purchase and sale of a Belgian business known as Sentinel Foam Products Europe, N.V. ("Sentinel Foam"). The Agreement requires that Sentinel Foam purchase certain extruding machinery, dies, and equipment for the production of non-crosslink polyethylene foam exclusively from P.I., Inc. and/or its affiliates. (Agreement ¶ 6.2.) It also prohibits Sentinel Foam from using these technologies outside of certain named countries and limits the use of the technology to extruding machinery manufactured by P.I., Inc. (Agreement ¶ 6.3.)

The complaint charges that Sentinel Foam and Scriptoria have violated the Agreement by purchasing these extruding technologies from entities other than P.I., Inc., and by using the proscribed technologies outside the named countries and on machinery other than extruding machinery manufactured by P.I., Inc.

The Agreement requires arbitration as follows: "Any dispute concerning the validity, the interpretation or the execution of this agreement shall be definitively settled in accordance to [sic] the Rules of Conciliation and Arbitration of the CEPA-NI, by one or several arbitrators appointed in accordance with these Rules." (Agreement ¶ 8.2.)

The Agreement also contains a choice-of-law provision which states: "This agreement is construed under and governed by the laws of Belgium." (Agreement ¶ 8.1.)

### III. Discussion

■■■■■] Plaintiff argues that its breach of contract claim asserting non-performance is outside of the scope of the arbitration clause, which applies only to issues of execution, validity, or contract interpretation. "If there are no questions as to the validity of the arbitration agreement itself, a court asked to compel arbitration must determine whether the arbitration agreement in fact covers the dispute in question." *Bercovitch v. Baldwin Sch., Inc.,* 133 F.3d 141, 148 (1st Cir.1998) (citations omitted). "In construing the scope of an arbitration agreement, 'questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.' " *Id.* (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). Moreover, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *PaineWebber Inc. v. Elahi,* 87 F.3d 589, 593 (1st Cir.1996) (quoting *Moses H. Cone Memorial Hosp.,* 460 U.S. at 24–25, 103 S.Ct. 927).

■■■ The First Circuit has recently addressed the applicability of the doctrine of *contra proferentem* (that any ambiguities in agreements must be construed against the drafters) in the context of arbitration agreements as follows:

It is true that, generally speaking, the presumption in favor of arbitration applies to the resolution of scope questions. That generality, however, does not profit the petitioners. A scope question arises "when the parties have a contract that provides for arbitration of some issues" and it is unclear whether a specific dispute falls within that contract. In framing the issue of a party's standing to compel arbitration as a scope question, the petitioners distort the meaning of term. Because the question of [Plaintiff's] standing goes to whether [Plaintiff] has a right to arbitrate *at all* vis-a-vis the managers, that question is not a scope question. The federal preference for arbitration does not come into play and, *a fortiori,* it cannot undermine the lower court's reliance on the *contra proferentem* tenet.

*Paul Revere Variable Annuity Ins. Co. v. Kirschhofer,* 226 F.3d 15, 25 (1st Cir.2000) (citations omitted). The doctrine of *contra proferentum* is one of last resort in Massachusetts and is especially tenuous "when the parties are sophisticated businesses." *Principal Mutual Life Ins. Co. v. Racal–Datacom, Inc.,* 233 F.3d 1, 2000 WL 1716483, *4 (1st Cir.2000) (construing Massachusetts law).

[5–7] "The 'primary purpose' of the [Federal Arbitration Act] is to ensure 'that private agreements to arbitrate are enforced according to their terms.' " *Paine-Webber,* 87 F.3d at 593 (quoting *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. Univ.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)). "Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit." *Id.* (quoting *Volt,* 489 U.S. at 479, 109 S.Ct. 1248). "Thus, whether an issue is to be decided by the arbitrator is a matter of the parties' contractual intent." *Id.* (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 57, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995)).

■■■ "We apply 'general state-law principles of contract interpretation' to an arbitration agreement, but with 'due regard' to the federal policy favoring arbitration." *Id.* at 600 (quoting *Volt,* 489 U.S. at 475–76, 109 S.Ct. 1248); *see also First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Mastrobuono,* 514 U.S. at 63–64 & n. 9, 115 S.Ct. 1212. While Belgian law applies here, neither side has briefed whether the issues are affected by its provisions.

This dispute largely turns on the definition of the term "execution" in paragraph 8.2 of the Agreement. Arguing that "execution" means performance, Defendant asserts that the arbitration provision is modeled after the language suggested by Cepani, which is the acronym for the Belgian Centre for Arbitration and Mediation. Again, the arbitration clause of the Agreement provides:

> Any dispute concerning the validity, the interpretation or the execution of this agreement shall be definitively settled *in* accordance to the Rules of Conciliation and Arbitration of the CEPANI, by one or several arbitrators appointed in accordance with these Rules.

Cepani's proposed English version of this clause is:

> Any dispute concerning the validity, the interpretation or the performance of the agreement shall be finally settled under the Rules of Cepani, by one or more arbitrators appointed in accordance with the said Rules.

Cepani's proposed French version of the clause is:

> Tout différend relatif à la validité, l'interprétation ou l'exécution du présent contrat, sera tranché définitivement suivant le règlement du Cepani par un ou plusieurs arbitres nommés conformément à ce règlement.

Defendant argues that a comparison of the arbitration clause at issue in the Agreement with the Cepani model clauses suggests that the term "execution" includes "performance."

Plaintiff asserts that the specific language of the provision is more limited, relying on one common legal usage of the term "execute," which has been defined as [t]o make (a legal document) valid by signing; to bring (a legal document) into its final, legally enforceable form <each party executed the contract without a signature witness>. *Black's Law Dictionary* 589 (7th ed.1999); *see also Travelers Ins. Co. v. Chicago Bridge & Iron Co.,* 442 S.W.2d 888, 895 (Tex.Civ.App.1969) ("The term 'execute' means 'to finish' or 'make complete'. The execution of a contract includes the performance of all acts necessary to render it compete as an instrument. The term imports the idea that nothing remains to be done to make a complete and effective contract."); *Seva Resorts, Inc. v. Hodel,* 876 F.2d 1394, 1398 (9th Cir.1989) ("The legal definition of the term 'execute' is: 'To perform all necessary formalities, as to make and sign a contract.' "). However, *Black's Law Dictionary* also defines the word *"execute"* as "[t]o perform or complete (a contract or duty) <once the contract was fully executed, the parties owed no further contractual duties to each other>." Black's Law Dictionary *at 589. Plaintiff's distinction between performance and execution of a contract is reflected in Massachusetts case law.* See, e.g., *Sheehy v. Lipton Indus., Inc.,* 24 Mass.App.Ct. 188, 194 n. 6, 507 N.E.2d 781 (1987) (holding that the implied covenant of good faith "pertains to bad faith in the performance of a contract, not in its execution.").

Commentators have discussed the confusion over the meaning of the word "execution" in the context of contract disputes. Williston commented:

> Technically speaking, if a transaction is fully executed on both sides, it is not properly described as a contract. In lay terminology, however, the term executed contract is often used to describe completely executed consensual agreements, such as sales completely carried out on both sides or wholly executed conveyances.... Legally, however, since the term contract is defined in terms of promise, requiring that something be done in the future, there can be no such thing as an executed contract.

Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 1:19, at 48 (4th ed.1990); *see also* 4 Caroline N. Brown, *Corbin on Contracts, Statute of Frauds* § 14.24, at 244 (rev. ed. 1997) ("It

is clear that, when used in this way, the term 'executed' does not mean 'performed.' If the agreement of the parties had been performed, there would be no need for reformation or enforcement.") Thus, even under American jurisprudence, the meaning of the elusive term "executed" depends on context. *See Black's Law Dictionary* at 589 (citing William R. Anson, *Principles of the Law of Contract*, 26 n. * (Arthur L. Corbin ed., 3d Am. ed. 1919) ("[T]he term 'executed' is a slippery word. Its use is to be avoided except when accompanied by explanation.")).

■■■■■ The linguistic differences between French and English create an additional wrinkle in determining the meaning of the term "execution" as it appears in the arbitration clause of the Agreement. A comparison of Cepani's proposed arbitration clauses suggests that use of the word "execution" in the Agreement could well have been intended to include the concept of performance. Although Defendant drafted the arbitration agreement, the doctrine of *contra proferentem* (i.e., construing an ambiguous document against the drafter) does not undermine the preference for arbitration when the disagreement concerns a pure scope question. *Paul Revere*, 226 F.3d at 25 (holding that doctrine of contra proferentem applied to the question of whether plaintiff had standing to demand arbitration, but "the presumption in favor of arbitration applies to the resolution of scope questions"). Where a term regarding the scope of arbitration is ambiguous, the issue is resolved in favor or arbitration. *PaineWebber*, 87 F.3d at 595.

Finally, when considering the intentions of the parties, the Court must ask: why would the parties have included disputes over interpretation of a contract in the arbitration clause but not performance, as the two issues are so often inextricably intertwined. Also, why would the parties agree to Belgian law but preserve a Massachusetts forum with the difficulties inherent in researching Belgian contract case law in a different language? In addition, why would the parties mandate arbitration for disputes over validity as well as execution, if the latter term is defined to mean making a document valid? All signs of the parties' intent point to an agreement to arbitrate in Belgium.

### *ORDER*

For the foregoing reasons, Defendant's Motion to Compel Arbitration (Docket No. 10) is *ALLOWED*.[1] The proceedings are stayed.

---

1. Defendant has also filed a motion to dismiss for lack of personal jurisdiction which it is not pressing if the court allows the motion to compel arbitration. Defendant claims, however, it is not waiving the jurisdictional issue. Whether the defendant can have its jurisdictional cake-and-eat-it-too awaits another day.