[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 346 
FabArc Steel Supply, Inc. ("FabArc"), appeals a summary judgment entered by the Morgan Circuit Court for Composite Construction Systems, Inc. ("CCSI"), and the denial of FabArc's cross-motion for summary judgment against CCSI, all with respect to FabArc's third-party action against CCSI in litigation arising out of a death at a construction site. We affirm in part, reverse in part, and remand.
Shimizu America Corporation ("Shimizu") was the general contractor for a commercial construction project near Decatur, Alabama, known as the "Toray project." Evodio Sanchez, an employee of J J Masonry, a subcontractor on the Toray project, was killed on April 13, 1998, when a masonry wall collapsed and fell on him following the removal of adjacent scaffolding. Cynthia Sanchez, as the personal representative of Evodio Sanchez's estate, filed a wrongful-death action against Shimizu, Don Chambers (the project superintendent for Shimizu), and various fictitiously named parties. By amendment filed seven months later, on December 7, 1999, Cynthia substituted FabArc, also a subcontractor on the Toray project, for one of the fictitiously named parties. Under its subcontract with Shimizu, FabArc had agreed to furnish and install the structural steel required for the job. Because FabArc was solely a steel fabricator, it had subcontracted to CCSI, a steel-erection company, the installation portion of FabArc's subcontract with Shimizu. Specifically, CCSI agreed "to furnish all labor, equipment, and insurance necessary to unload and complete the erection" of the structural steel called for by the subcontract between Shimizu and FabArc. Thus, as between FabArc and CCSI, FabArc retained responsibility for providing the steel components and delivering them to the job site, and CCSI assumed responsibility *Page 347 
for unloading the steel and then installing it when and as called for by the Shimizu-FabArc subcontract.
The complaint alleged the following as to FabArc:
 "Defendant FabArc and any employees and/or agents thereof, negligently or wantonly failed to provide and/or install proper and adequate supports, anchors, and fasteners to secure and stabilize the masonry wall which collapsed and killed Plaintiff's decedent, Evodio Sanchez. Said negligent and wanton conduct was a proximate cause of the wrongful death of Evodio Sanchez."
Shimizu asserted a cross-claim against FabArc for indemnity based on a clause in their contract under which FabArc had agreed to indemnify and hold harmless Shimizu
 "from and against all claims, damages, loss and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Subcontractor's Work provided that:
 "(1) Any such claim, damage, loss, or expense is attributable to bodily injury, sickness, disease or death, or injury to or destruction of tangible property (other than the Subcontractor's Work itself) including the loss of use resulting therefrom to the extent caused or alleged to be caused in whole or in any part by any negligent act or omission of the Subcontractor or anyone directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable, regardless of whether it is caused in part by a party indemnified hereunder."
FabArc, in turn, filed a third-party complaint against CCSI seeking indemnification for any damages that might be directly imposed on FabArc in the action and any for indemnity FabArc might be determined to owe to Shimizu. Additionally, FabArc charged that CCSI had "breached its contractual duty by failing to name FabArc Steel an additional insured without exception(s) under its comprehensive liability policy." In those respects, FabArc relied on the following provisions of its subcontract with CCSI:
 "The Sub-Contractor agrees to furnish all labor, equipment, and insurance necessary to unload and complete the erection of steel and decking studs to include but not necessarily limited to: Structural steel, bar joists and bridging, composite deck, shear connectors, roof deck, checker plate, expanded metal grating, moment connections.
 "All items per Attachment `A.' (Contract between Shimizu and FabArc Steel).
". . . .
 "3. It shall be the obligation of the Sub-Contractor under this agreement . . . to obtain public and general liability insurance covering property and personal injury damages. . . . The general liability insurance coverage should be for a minimum of $1,000,000/occurrence and $1,000,000/aggregate. As a condition precedent of Sub-Contractor beginning work on the project, Sub-Contractor shall furnish a certificate satisfactory to FabArc from each insurance company showing the required insurance is in force and effect. . . . In the event Sub-Contractor fails to furnish or maintain the agreed to insurance, FabArc may obtain said insurance for the Sub-Contractor and FabArc shall be reimbursed out of monies otherwise due the Sub-Contractor for the premiums, overhead and other costs that may be incurred by FabArc by reason of FabArc obtaining such insurance for the Sub-Contractor.
 "4. The Sub-Contractor hereby covenants and agrees to defend, indemnify, *Page 348 
and exonerate FabArc from all liability claims, actions, causes of action, lawsuits, and demands (including all judgments and settlements made at arms length and all attorney fees and litigation expense connected therewith) for, personal injury or death . . . arising out of any work or operation performed by, for and on behalf of the Sub-Contractor or arising out of Sub-Contractor's negligence, even if Sub-Contractor is only partly negligent for the damage or injury. The foregoing covenant and agreement shall include all such liabilities, claims, lawsuits and demands where it is charged, alleged or proven that the Sub-Contractor (or its agents or employees) was in any way at fault in causing or contributing to such injury, death or property damage. The Sub-Contractor's liability insurance policies shall each contain contractual insurance coverage as to the covenant contained in this section. The contractor shall be named as an additional insured in the Sub-Contractor's general comprehensive and public liability policy. A copy of said general comprehensive and public liability insurance policy showing FabArc as an additional insured shall be furnished to FabArc prior to Sub-Contractor beginning performance. . . .
 "5. Sub-Contractor's Work shall be performed in accordance with the requirements of this Agreement and Contract Documents. With respect to Subcontractor's Work, Sub-Contractor agrees to be bound to FabArc by all of the terms and provisions of the Contractor Documents, and to assume toward FabArc all of the duties, obligations, and responsibilities that FabArc, by those Contract Documents, assumes toward the Owner and/or the General Contractor, including all obligation of owners' and/or general contractors' safety program."
CCSI has never been named as a defendant in the Sanchez action.
Early in 2001 Shimizu's insurers, including its excess insurer, Great American Assurance Company ("Great American"), settled Cynthia's claims against Shimizu. Shimizu's primary carrier contributed $1,000,000 to the settlement and Great American contributed $2,500,000. FabArc also participated in the settlement, paying $600,000 to settle Cynthia's claims against Shimizu. Neither FabArc nor its liability insurance carrier contributed any money on behalf of Shimizu to settle Cynthia's claims against Shimizu, despite demands on them to do so; and neither CCSI nor its liability insurer carrier contributed any money on behalf of FabArc to settle either Cynthia's or Shimizu's claims against it, despite demands on them to do so.
In October 2001 Great American, proceeding as subrogee of Shimizu, filed its "complaint in intervention" in the action, seeking indemnification from FabArc and CCSI under the terms of the indemnification clause in the subcontract between Shimizu and FabArc. As noted earlier, that indemnification clause obligated FabArc to indemnify Shimizu against all claims that, among other things, arose out of FabArc's work, "to the extent [Evodio's death was] caused or alleged to be caused in whole or in part by any negligent act of [FabArc] or anyone directly or indirectly employed by [FabArc] or anyone for whose acts [FabArc] may be liable. . . ." (Emphasis supplied.) The trial court entered a summary judgment in favor of Great American against FabArc, reasoning, in pertinent part:
 "The indemnity provision [in the subcontract between Shimizu and FabArc] is not ambiguous as a matter of law. The plain language of the provision provides an `either-or' event which triggers FabArc's *Page 349 
obligation to indemnify. . . . At the time the plaintiff amended her complaint and alleged that the death was proximately caused by the negligent or wanton acts of FabArc and any employees and/or agents of FabArc, FabArc was obligated to indemnify Shimizu from and against the claim of the plaintiff for the death of Evodio Sanchez, including but not limited to attorney's fee."
(Emphasis in original.)
Conversely, the trial court entered summary judgment in favor of CCSI and against Great American, holding that Great American's claim against CCSI was dependent on the theory that Shimizu was an intended third-party beneficiary of FabArc's subcontract with CCSI, whereas Shimizu's contract with FabArc expressly provided that nothing in it would "create any subcontractual relationship between [Shimizu] . . . and any lower-tier subcontractor." Accordingly, the trial court held, CCSI owed no duty of indemnity to Shimizu. FabArc appealed the summary judgment against it and in favor of Great American; this Court affirmed that judgment without opinion on June 11, 2004. FabArc Steel Supply, Inc. v.Great American Assurance Co. (No. 1030084, June 11, 2004), ___ So.2d ___ (Ala. 2004) (table). That judgment has been satisfied by FabArc's insurer by the payment to Great American of the sum of $3,091,369.86 representing the $2,500,000 judgment together with court costs and accrued interest.
On August 6, 2004, the trial court entered companion orders: one entering a summary judgment for CCSI as to all claims made against it by FabArc as third-party plaintiff and the other denying FabArc's cross-motion for final judgment on its third-party claims for indemnity. The court included no findings or rationale in either order; it certified both orders as final, for purposes of appeal, pursuant to Rule 54(b), Ala. R. Civ. P. FabArc appeals from both.
On FabArc's motion, without opposition from CCSI, this Court ordered on October 8, 2004, that the record on appeal in case no. 1030084 be incorporated into the record on appeal in this case; the result is that the combined record the parties rely on in their briefs comprises 6,659 pages.
FabArc's present appeal involves two main issues: First, whether CCSI should indemnify it with respect to (a) its settlement of the claims Cynthia asserted directly against it and (b) its payment of the indemnification claims Great American successfully asserted against it. Second, whether the trial court erred in entering a summary judgment for CCSI on FabArc's claim that CCSI breached its contractual duty to procure insurance given that, according to FabArc, the record reflects the existence of genuine issues of material fact as to that claim and, in any event, it was not ripe for disposition because of collateral litigation pending in the federal court.
As noted, Cynthia alleged generally against FabArc that it and its "employees and/or agents," had "negligently or wantonly failed to provide and/or install proper and adequate supports, anchors, and fasteners to secure and stabilize the masonry wall that collapsed and killed Plaintiff's decedent, Evodio Sanchez." FabArc contends that, by process of elimination under the undisputed facts, these allegations can be understood to relate only to the alleged failure by it, through CCSI, to install anchors or fasteners known as "angle clips."
As CCSI acknowledged to the trial court in its "Legal Memorandum in Support of CCSI's Motion for Final Judgment on Third-Party Claims of Plaintiff FabArc Steel Supply, Inc.," it "had responsibility for installing angle clips to the horizontal metal beam above masonry walls on the Toray project." It went on to explain: *Page 350 
 "Plaintiff's decedent was fatally injured when a wall that was being built by his employer (J J [Masonry]) collapsed. The general construction sequence of and problems with the subject wall were as follows:
"The Wall
 "Re-bar should have been placed in the cement footings prior to the first course of brick. This wall lacked any such in-footing re-bar. It was the responsibility of the `footing' company to include re-bar in the footings. In other words, neither FabArc nor CCSI had responsibility for placing re-bar in the footings.
 "Brick ties¹ should have been added to the wall as every two or three courses of brick are added. The ties would then be welded onto the vertical columns that were adjacent to the wall. This wall lacked vertical brick ties that secured the wall to the adjacent vertical columns. Neither FabArc nor CCSI had any responsibility or duty to install brick ties to vertical columns. That was the responsibility of the masonry contractor, J J.
 "After the construction of the masonry wall was complete, angle clips were to be welded onto the horizontal steel beam that traversed above the wall. The wall must be complete before these clips are to be installed. J J was to inform Shimizu when the wall was ready to have angle clips attached to the steel beam. Then, after the clips had been welded onto the beam, J J was responsible for attaching them to the masonry wall with anchor bolts. The protocol on the Toray job was for J J to inform Shimizu when the masonry wall was ready for the angle irons to be added to the horizontal steel beam. Shimizu was never informed that the subject wall was ready for angle clips to be attached to the horizontal steel. Thus, nobody advised CCSI that the wall was ready for the clips to be welded onto the horizontal steel beam. Attachment of the angle clips to the steel beam did not in any way support or secure the wall. It was only after J J bolted the clips to the wall that any support would have been provided.
 "OSHA requires that adequate bracing be provided to `any wall greater than eight (8) feet in height to prevent collapse unless the wall is adequately supported so that it will not overturn or collapse. The bracing shall remain in place until permanent supporting elements of the structure are in place.' 29 CFR 1926.706(b) (emphasis added). During its construction, the subject wall was supported by scaffolding and gravity, only. The masonry contractor, J J, removed the scaffolding immediately prior to the collapse, even though it had not advised Shimizu that the wall was ready for angle clips to be attached to the horizontal steel beam. That is, the only support for the wall, other than gravity, was removed by J J. Shimizu was unaware that the scaffold was being removed.
 "¹ Some counsel for the underlying parties at depositions sometimes used the phrases `clips,' `ties', or `angles' interchangeably to refer both to brick ties that secured the wall to adjacent vertical columns, as well as to angle clips that were affixed to a steel beam that traversed above the wall and that was supposed to be attached to the wall using anchor bolts. The undisputed evidence is that CCSI had no responsibility regarding the brick ties and vertical columns. The undisputed evidence is also that CCSI's only relation to the angle clips was in affixing them to the steel beam only after they had been advised *Page 351 
by the masonry contractor that the wall was ready for the angle clips to be welded onto the steel beam. It is undisputed that CCSI was not responsible for attaching the wall to the beam via the angle clips and anchor bolts. For the sake of clarity, in this brief, `angle clips' refers to the horizontal beam, and `brick ties' refers to the vertical columns."
(Internal parenthetical source citations omitted.)
Robert Bruce Stewart, a vice president at CCSI, explained on his deposition that an angle clip is "a short piece of angle [iron] generally just added to the structural steel to support something else . . . a piece of angle iron, sometimes symmetrical in dimension, sometimes maybe a little longer on one side than the other, maybe four or five inches long" that "kind of looks like an L."
The only allegation of deficient contractual performance made by Shimizu in particularized form in its cross-claim against FabArc was that FabArc had breached its contractual obligations to Shimizu "[b]y failing to furnish and install all angle clips or angle irons in a timely manner; . . . [b]y failing to install angle clips or angle irons attaching masonry work to the structural steel." (The record reflects that the parties fully understood the term "angle irons" to be simply an alternative industry designation for, and to be synonymous with, the term "angle clips.")
In the narrative statement of undisputed facts that Great American submitted to the trial court in support of its motion for a summary judgment on its subrogation claim against FabArc, Great American likewise took the position that FabArc's liability exposure related solely to the absence of the angle clips. Great American charged that the angle clips, "the absence of which was alleged to be the cause of the death of [Evodio] Sanchez," were included within the scope of FabArc's structural steel work and that "FabArc, in turn, entered into a contract with [CCSI]" whereby CCSI agreed "to perform the structural steel work that FabArc had contracted with Shimizu to perform." Great American otherwise made it clear that its subrogated claim for indemnity from FabArc was predicated on the circumstance that FabArc's alleged liability for Evodio's death was premised solely on the proposition that FabArc, through CCSI, had failed to install the angle clips. In fact, Great American used the caption "FabArc Failed in its Responsibility to Install the Angle Clips" to introduce its discussion of FabArc's alleged liability, asserting that it was "undisputed that FabArc failed to weld angle iron clips to the overhead beams of the subject masonry wall" and that a representative of J J Masonry had testified on deposition that his company had not installed the wall anchor designed to connect to the angle clip because FabArc had not welded the angle clips in place.
With respect to FabArc's duty to provide the angle clips, the record is clear that it did provide them, and CCSI does not contend otherwise. Don Chambers, Shimizu's project superintendent for the Toray project, testified that the angle clips (which he referred to as "angle iron") were "furnished by FabArc Steel and installed by FabArc Steel, one of our subcontractors, . . . and you could see them installing them. So you knew they were doing it." Tommy Hart, the field foreman for CCSI on the Toray project, testified that he did not know for sure if the angle clips were on site on the day the wall collapsed, but "if they wouldn't have been, there was material there that you could make clips out of." He went on to explain that if CCSI had been "short one or two angle clips," then "we might have cut a piece of *Page 352 
angle, one or two, of the exact of whatever it was calling for"; that they had some iron on site and it would have been a pretty easy process to use a cutting torch to shape an angle clip out of the iron. Hart had told Chambers that CCSI would be ready and willing to weld angle clips onto the horizontal beam over the top of any masonry wall where needed, whenever the wall reached the stage of completion where welding the angle clips would be appropriate, and Chambers notified Hart of that fact. Pursuant to that arrangement, before the wall collapse that killed Evodio, Chambers had notified Hart that another wall was ready for the installation of angle clips, and Hart had installed them. Alan Heathcock, project manager for FabArc, testified by deposition, "we had those [angle] clips on site." John Lazau, Shimizu's project manager, testified that, according to FabArc's contract with Shimizu, all of the horizontal angle clips were to be welded by FabArc or its subcontractor and stated that "I've seen angle clips being welded to the structural members" while on the job site and "that work was done by CCSI which was the erector subcontractor for FabArc Steel."
CCSI does not contend that angle clips were not available to it to install when the time came. Rather, it simply argues that it had no duty to install the angle clips until it was notified that the masonry wall had reached a stage of completion allowing for the installation of the clips and that it was never so notified. Apart from the generic alternative phrasing of Cynthia's complaint, i.e., that FabArc "failed to provide and/or install" supports, etc., there is no allegation or evidence anywhere in the record to the effect that FabArc might have failed to provide angle clips for installation by CCSI. In short, and the record is repetitive and unequivocal on this point, the only default or dereliction attributed to FabArc, once discovery had been conducted and the parties' contentions had crystallized, was that it had failed to fulfill its contractual duty to install the angle clips.
Donald Dobbins, president of CCSI, acknowledged in his deposition that "the [angle] clips would have been the responsibility of CCSI under its subcontract with FabArc." He agreed that it was not anticipated by either CCSI or FabArc that FabArc would have a daily presence at the job site and, in fact, it was anticipated that FabArc would rely on CCSI to do all installation at the job site without the presence of FabArc personnel. The combined testimony of Dobbins and Hart was to the effect that Heathcock was the only FabArc employee expected to visit the job site and that he did so on only a very few occasions. Heathcock's presence was not expected or needed otherwise because, according to Hart, the job was "really smooth," and he and Heathcock communicated satisfactorily by cellular telephone.
CCSI represented FabArc in attending all meetings at the job site, including safety meetings, and Shimizu accepted that arrangement because, in Hart's words, "[a]s far as Shimizu was concerned, [CCSI and FabArc were] one and the same." Hart understood that he was to attend all necessary meetings on behalf of FabArc and that he was "to be their eyes and ears on the job site." With respect to the entries in the minutes of the last two job-site meetings conducted before Evodio's death, on April 3 and 10, 1998, stating that FabArc needed to install the angle clips "ASAP," Hart had understood those references to mean that CCSI should perform that task, because it had been delegated to it by FabArc; he knew that it was CCSI's responsibility, not FabArc's, to install the angle clips. CCSI states in its principal brief to this Court that "Mr. Dobbins admitted that the installation of the clips were [sic] the responsibility of CCSI." It *Page 353 
explains, however, that "no one notified CCSI that the wall was ready for angle clips to be welded onto the horizontal beam" and that "the undisputed evidence is that the subject wall was not constructed to the point that CCSI's task were yet necessary."
The minutes for the "Weekly Sub-Contractor's Meeting" for March 27, April 3, and April 10, 1998, each reflect that FabArc was a "required attendee," and the March 27 minutes reflect that Hart attended that meeting on FabArc's behalf. After that meeting, however, the progress of the work was such that CCSI began leaving the job site on Thursday of each week; consequently, neither Hart nor any other CCSI representative attended the meetings conducted on Friday, April 3, and Friday, April 10. The minutes for those two meetings contain the statement "FabArc Steel should continue to install miscellaneous steel. Some of the following is needed ASAP. Install clips from steel beams to masonry walls." To that statement in the April 10 minutes is appended the explanation "this is being worked on now." Hart offered the explanation during his deposition that such repetitive references in the minutes did not necessarily indicate that any work was being neglected, because some entries just got repeated in the minutes without regard to whether actual job conditions were right or appropriate for performance of the particular task. Hart acknowledged in his deposition that the references to the installation of "clips from steel beams to masonry walls" were references to angle clips, but insisted that "we would have put them in. Just because it is in the minutes, doesn't mean it's ready." On April 13, the day of the fatality, CCSI personnel showed up at the job site but, because of windy conditions, left and did no work that day.
Paragraph 4 of the subcontract between FabArc and CCSI, quoted earlier, contains indemnity provisions. Only the first two sentences of that paragraph are at issue in this case. Carefully parsed for language potentially applicable to the facts of this case, the first two sentences of paragraph 4 provide for indemnity in three separate situations. CCSI agreed "to defend, indemnify, and exonerate FabArc from all liability claims, actions, causes of action, lawsuits, and demands . . . for . . . death":
 1. arising out of any work or operation performed by, for and on behalf of CCSI (the "arising-out-of-work provision"); or
 2. arising out of CCSI's negligence, even if CCSI was only partly negligent for the damage or injury (the "arising-out-of-negligence provision"); or
 3. where it was charged, alleged, or proven that CCSI was in any way at fault in causing or contributing to such injury, death, or property damage (the "allegation provision").
1. The Arising-out-of-Work Provision.
FabArc insists that the indemnity provisions in its subcontract with CCSI are "clear and unambiguous" and, as to the arising-out-of-work provision, CCSI agrees that it is "clear and certain"; nonetheless, they disagree as to the meaning of the provision. FabArc argues that the provision "does not impose a common law tort standard of negligence, nor does it require that FabArc prove that CCSI was guilty of negligence." Rather, FabArc goes on to argue, because CCSI's responsibility for installing the angle clips constitutes "the only link between FabArc and the collapse of the wall," that link "is sufficient to meet the contract term that the claim `arise out of' CCSI's work." FabArc asserts that each element of the arising-out-of-work provision of the indemnity clause "is either defined in the CCSI subcontract itself or is *Page 354 
the subject of well-established caselaw precedent." Although the CCSI subcontract defines the work to be performed under it, it does not define in any way the phrase "arising out of any work or operation performed by" CCSI. As to "well-established caselaw precedent," FabArc cites no Alabama cases and, in fact, cites only one case: Chicago, R.I. P.R.R. v. Dobry Flour Mills,Inc., 211 F.2d 785, 788 (10th Cir. 1954). We do not find that case instructive, however, because it did not involve an indemnification clause that included the term "arising out of," but rather a clause indemnifying "for loss, damage or injury from any act or omission of the [indemnitor]." The opinion did emphasize that the action by the indemnitor against the indemnitee was "not predicated upon the general law of torts but upon an indemnity contract." Apart from that case, FabArc does not discuss or cite any other legal authority pertinent to the proper interpretation and construction of the phrase "arising out of any work or operation performed by, for or on behalf of the Sub-contractor." Rule 28(a)(10), Ala. R.App. P., requires that argument in an appellant's (or a cross-appellant's) brief contain "citations to the cases, statutes, other authorities, and parts of the record relied on." The effect of a failure to comply with Rule 28(a)(10) is well established:
 "It is settled that a failure to comply with the requirements of Rule 28(a) ([10]) requiring citation of authority for arguments provides the Court with a basis for disregarding those arguments:
 "`When an appellant fails to cite any authority for an argument on a particular issue, this Court may affirm the judgment as to that issue, for it is neither this Court's duty nor its function to perform an appellant's legal research. Rule 28(a) ([10]); Spradlin v. Birmingham Airport Authority, 613 So.2d 347 (Ala. 1993).'
 "City of Birmingham v. Business Realty Inv. Co., 722 So.2d 747, 752 (Ala. 1998). See also McLemore v. Fleming, 604 So.2d 353 (Ala. 1992); Stover v. Alabama Farm Bureau Ins. Co., 467 So.2d 251 (Ala. 1985); and Ex parte Riley, 464 So.2d 92 (Ala. 1985)."
Ex parte Showers, 812 So.2d 277, 281 (Ala. 2001).
CCSI likewise does not cite in its brief any caselaw or legal authority discussing the meaning to be accorded to the arising-out-of-work provision, with the exception of the following quotation cited from 68 A.L.R.3d Indemnity § 13 (2003):
 "The concept of indemnity, it has been held, does not include any and all liability without reference to cause or the indemnitor's work. Causation of loss is the touchstone of liability under a construction contract indemnity clause. An agreement to indemnify the contractor for liability for damages on account of any acts or omissions of the subcontractor clearly requires a causal connection between the damages and an act or omission of the subcontractor or some default of the subcontractor as an indemnity requirement."
(Footnotes omitted.)
CCSI's argument is that the arising-out-of-work provision in the subcontract requires that some causal connection be established between the work and operations it performed and Evodio Sanchez's death. It argues that because the evidence was undisputed that the wall that collapsed onto Evodio was not at the point of construction where it was appropriate for CCSI to weld angle clips onto the horizontal beam above the wall and, moreover, because CCSI had never been notified that it was time for it to weld any angle clips onto the beam, "Sanchez's death could not have arisen from CCSI's work. . . ." *Page 355 
Our independent research has located only one Alabama case discussing in any way the meaning to be accorded to an indemnification clause similar to the one under consideration here. In Brown Mechanical Contractors, Inc. v. CentennialInsurance Co., 431 So.2d 932 (Ala. 1983), this Court interpreted a provision indemnifying the subcontractor "`as to and from all liability, claims, lawsuits and demands for personal injury and property damage arising out of work undertaken or to be performed by the Subcontractor, its employees, agents and subcontractors, and arising out of any other operation no matter by whom performed for and on behalf of the Subcontractor."431 So.2d at 945 (emphasis omitted). This Court concluded that because the subcontractor's "welding was the source of the fire" that caused the property damage, the general contractor's liability could be viewed as "`arising out of' [the subcontractor's] work in the sense that the fire and [the contractor's] related tort liability would not have come about but for [the subcontractor's] welding."431 So.2d at 945. FabArc does not contend in its briefs to this Court that any work or operation performed by CCSI caused the wall to collapse. FabArc acquiesces in CCSI's stated position that the wall had not reached the stage of completion where it was appropriate for angle clips to be welded to the overhead horizontal beam and that, independent of that fact, no one had ever notified CCSI that it was time to install the angle clips. CCSI adduced substantial evidence in support of its summary-judgment motion indicating that the collapse of the wall did not in fact arise out of any work or operation performed by it with respect to the installation of angle clips, because the time for the installation of those clips had not arrived.
Our research of authority beyond this State has located discussions of the term "arising out of" in several legal treatises and texts, which, in turn, discuss cases from other jurisdictions. These include § 15 of the same A.L.R.3d annotation from which CCSI quoted § 13, i.e., Maurice T. Brunner, Annotation,Liability of Subcontractor upon Bond or Other AgreementIndemnifying General Contractor Against Liability for Damage toPerson or Property, 68 A.L.R.3d 7 (1976); 3 Philip L. Bruner 
Patrick J. O'Connor, Jr., Bruner and O'Connor on ConstructionLaw §§ 10:58, 10:61, 10:63, 10:65, and 10:67 (2002); Dwight G. Congra et al., Construction Accident Litigation § 7:4 (2d ed. 2002); Debra S.P. Cheng, Recent Decisions: The Maryland Court ofAppeals (pt. III), 58 Md. L.Rev. 604, 681 (1999); Joseph P. Musacchio, Contribution and Indemnity, in 2 Massachusetts Tort Law Manual, Ch. 16 (2002); and George Chamberlin, Cause ofAction to Enforce Contractual Right to Indemnification RespectingPersonal Injury Claim, in 7 Causes of Action 509 (2d ed. 1995). These sources reflect that different courts have accorded different treatment to so-called "work-related" indemnity clauses, using some version of the phrase "arising out of the performance of the work," which have required different levels of, or even dispensed with the necessity for, a causal connection between an injury or death and the performance of the work.
It is the appellant's obligation to demonstrate error on the part of the trial court and, as noted above, that includes providing this Court with citations to pertinent cases, statutes, and other authorities. Other than noting our awareness of the existence of caselaw and other authorities that address the "arising out of work" concept in indemnity clauses, we will not go further and attempt to analyze that caselaw and those authorities for the purpose of reversing the judgment of the trial court. Under the facts of this case, the *Page 356 
trial court could well have concluded that the death of Evodio Sanchez did not arise out of any "work or operation performed by" CCSI, inasmuch as CCSI never performed any work or operation relating to angle clips with respect to the wall that collapsed, because the time for its performance of that task never arose.
FabArc argues that under the combined effect of Stone BuildingCo. v. Star Electrical Contractors, Inc., 796 So.2d 1076 (Ala. 2000) ("Stone I"), and Star Electrical Contractors, Inc. v.Stone Building Co., 863 So.2d 1071 (Ala. 2003) ("Stone II"), "the indemnitee need not prove its actual liability in the underlying suit. Rather, the indemnitee need only prove that it (the indemnitee) had potential liability in the underlying suit." The pertinent passage in Stone I, representing a portion of its lengthy quote from 41 Am.Jur.2d Indemnity § 46 (1995), is as follows:
 "`A person legally liable for damages who is entitled to indemnity may settle the claim and recover over against the indemnitor, even though he has not been compelled by judgment to pay the loss. In order to recover, the indemnitee settling the claim must show that the indemnitor was legally liable, and that the settlement was reasonable. In the event that an indemnitor is not afforded the alternative of participating in a settlement or conducting the defense against the original claim, an indemnitee settling the claim will have the burden of establishing actual liability to the original plaintiff rather than the lesser burden of showing potential liability.
 "`However, when the indemnitor has notice of the claim and refuses to defend, the indemnitor is bound by any good faith reasonable settlement, and the indemnitee need only show potential liability.'"
796 So.2d at 1090 (emphasis omitted; emphasis added).
CCSI counters to argue that the "potential liability" concept is not an issue in this case because the trial court concluded that CCSI was not legally liable for indemnification of FabArc in that the indemnity provisions were not triggered. FabArc acknowledges that the indemnitee must first be entitled to indemnity before the "potential liability" rule comes into play, citing numerous cases to that effect in a footnote to its principal brief, the holdings of the first two of which, as summarized by FabArc, are representative of the entire group:
 "Accord, Southern Ry. Co. v. Georgia Kraft Co., 823 F.2d 478, [481] (11th Cir. 1987) (even if the indemnitee reasonably settled with the injured party, `but the injury is not covered by the indemnity agreement, then the indemnitor is not libel to the indemnitee.'); Consolidated Rail Corp. v. Ford Motor Co., 751 F.Supp. 674, 676 (E.D.Mich. 1990) (an indemnitee must show that the `fact situation of the original claim was covered by the contract of indemnity')."
CCSI states in its brief that it "is not at this time challenging the reasonableness of FabArc's settlement, or even FabArc's liability indemnity to Shimizu (Great American)."
We agree with CCSI that if none of the triggering circumstances was shown by FabArc to exist, FabArc never established that it was "entitled to indemnity" from CCSI or that CCSI otherwise "was legally liable" to provide indemnity. This, despite the holding of Stone I, as summarized in Stone II, that "the jury's finding that [the indemnitor] was not liable to the [underlying plaintiffs] under a theory of negligence could not resolve the issue whether [the indemnitor] was liable under the indemnity agreement. . . ." 863 So.2d at 1075. *Page 357 
Accordingly, we would not reverse the summary judgment for CCSI to the extent it was predicated upon a finding that FabArc had failed to establish that its liability for the death of Evodio Sanchez arose out of any work or operation performed by CCSI.
2. The Arising-out-of-Negligence Provision.
FabArc does not argue that substantial evidence existed indicating that Evodio Sanchez's death arose out of CCSI's negligence in any fashion; it argues only that CCSI's negligence was sufficiently charged or alleged to trigger the "allegation provision." Accordingly, we would not posit a reversal of the summary judgment under the arising-out-of-negligence provision.
3. The Allegation Provision.
CCSI argues that the allegation provision of the indemnity clause is ambiguous and that one reasonable reading of the provision would be that a duty of indemnity on CCSI's part would be triggered only when it was explicitly "charged" or "alleged" in a claim, lawsuit, or demand that CCSI in particular had been in some way at fault in causing or contributing to Evodio's death. CCSI points out that by the time Cynthia amended her complaint to allege that "FabArc and any employees and/or agents thereof" had failed to provide and/or install proper and adequate supports and anchors for the wall that collapsed and killed Evodio, she knew through discovery conducted in the case that FabArc had subcontracted to CCSI the responsibility for installing the anchor clips. CCSI argues that despite that knowledge, Cynthia avoided naming CCSI as a defendant along with FabArc, choosing instead to reference only FabArc's "employees and/or agents," not FabArc's "employees and/or agents and/or subcontractors." CCSI argues that the allegation provision, because it is ambiguous, must be construed against FabArc, the drafter of the subcontract.
FabArc counters that the allegation provision was triggered by Cynthia's complaint because, it argues, after all is said and done, the only theory of potential liability against FabArc ever identified by any of the parties from within Cynthia's umbrella allegation was that FabArc was liable because the angle clips had not been installed, which task, as between FabArc and CCSI, was solely the responsibility of CCSI. Thus, according to FabArc, the complaint implicitly and sufficiently charged or alleged that CCSI was in some way at fault in causing or contributing to Evodio Sanchez's death.
We agree with CCSI that the provision is ambiguous, a determination that is a matter of law, which we decide de novo.SouthTrust Bank v. Copeland One, LLC, 886 So.2d 38 (Ala. 2003). A contractual provision is ambiguous if it is reasonably susceptible of more than one meaning. Alfa Mut. Ins. Co. v.Nationwide Mut. Ins. Co., 684 So.2d 1295, 1299-1300 (Ala. 1996). "[I]f the court determines that the terms are ambiguous (susceptible of more than one reasonable meaning), then the court must use established rules of contract construction to resolve the ambiguity." Homes of Legend, Inc. v. McCollough,776 So.2d 741, 746 (Ala. 2000) "[I]f all other rules of contract construction fail to resolve the ambiguity, then, under the rule of contra proferentem, any ambiguity must be construed against the drafter of the contract." 776 So.2d at 746. However,
 "[t]he rule of contra proferentem is generally a rule of last resort that should be applied only when other rules of construction have been exhausted. 3 Arthur L. Corbin, Contracts § 559 at 268-69 *Page 358 
(1962); see also Molton, Allen Williams, Inc. v. St. Paul Fire Marine Ins. Co., 347 So.2d 95, 99
(Ala. 1977) (indicating that ambiguities must be interpreted against the party drawing the contract if the circumstances surrounding the contract do not make the terms clear)."
Lackey v. Central Bank of the South, 710 So.2d 419, 422 (Ala. 1998).
Contract terms will not be construed against the party who framed them if other rules of construction would be thwarted in their legitimate operation by the application of that rule of construction. Denson v. Caddell, 201 Ala. 194, 77 So. 720, 722
(1917); G.F.A. Peanut Ass'n v. W.F. Covington Planter Co.,238 Ala. 562, 192 So. 502 (1939). "[T]he intention of the party to a contract controls its interpretation and . . . to ascertain such intention, regard must be had to the subject matter, the relationship of the parties at the time of the contract, and the law which it is justly inferable they had in view while contracting." G.F.A. Peanut Ass'n, 238 Ala. at 566,192 So. at 506. "`It is well settled that where there is uncertainty and ambiguity in a contract, it is the duty of the court to construe the contract so as to express the intent of the parties.'"BellSouth Mobility Co. v. Cellulink, Inc., 814 So.2d 203, 216
(Ala. 2001) (quoting Weathers v. Weathers, 508 So.2d 272, 274
(Ala.Civ.App. 1987)).
 "[I]f the trial court finds the contract to be ambiguous, it `must employ established rules of contract construction to resolve the ambiguity.' Voyager Life Ins. Co. v. Whitson, 703 So.2d 944, 948 (Ala. 1997). If the application of such rules is not sufficient to resolve the ambiguity, factual issues arise:
 "`If one must go beyond the four corners of the agreement in construing an ambiguous agreement, the surrounding circumstances, including the practical construction put on the language of the agreement by the parties to the agreement, are controlling in resolving the ambiguity.'
 "Id. at 949. Where factual issues arise, the resolution of the ambiguity becomes a task for the jury. McDonald v. U.S. Die Casting Dev. Co., 585 So.2d 853 (Ala. 1991)."
Alfa Life Ins. Corp. v. Johnson, 822 So.2d 400, 405 (Ala. 2001).
In construing indemnity provisions,
 "the degree of control retained by the indemnitee over the activity or property giving rise to liability is a relevant consideration. This is true because the smaller the degree of control retained by the indemnitee, the more reasonable it is for the indemnitor, who has control, to bear the full burden of responsibility for injuries that occur in that area."
City of Montgomery v. JYD Int'l, Inc., 534 So.2d 592, 595 (Ala. 1988). See also Royal Ins. Co. of America v. WhitakerContracting Corp., 824 So.2d 747 (Ala. 2002).
In construing an ambiguous contract to determine the intent of the parties, the Court should be guided by the following principles. The Court derives the intent of the parties from the contract as a whole. Ex parte University of South Alabama,812 So.2d 341 (Ala. 2001); Land Title Co. of Alabama v. State exrel. Porter, 292 Ala. 691, 299 So.2d 289 (1974). The relations of the parties, the subject matter of the contract, and the object to be accomplished may be looked to in construing the contract to ascertain the intention of the parties. Pacific Ins.Co. v. Wilbanks, 283 Ala. 1, 214 So.2d 279 (1968); City ofBirmingham v. I.E. Morris Assocs., 256 Ala. 273, 54 So.2d 555
(1951); Merchants' *Page 359 Nat'l Bank of Mobile v. Hubbard, 220 Ala. 372, 125 So. 335
(1929).
Donald Dobbins, the president of CCSI, testified that FabArc was perhaps CCSI's best customer and that FabArc and CCSI had been working together for between 5 and 10 years, during which time a significant portion of the thousands of jobs CCSI had performed were performed in conjunction with FabArc. He stated that he was aware that FabArc had never had its own erection force and that FabArc was essentially a fabricator that used subcontractors to install the items it fabricated. According to Dobbins, CCSI and FabArc had had a long-standing, mutually beneficial relationship for many years prior to the Toray project. FabArc used the same form contract again and again with CCSI, Dobbins testified, and he became very familiar with it. Stewart would generally do the initial negotiating with FabArc concerning the scope of the work and the financial terms, and if those details were resolved, the contract would then be passed on to Dobbins for review. At that point, Dobbins's "function was primarily to overview all of the contracts in terms of legal language and all of the clauses, the boilerplate, all that kind of stuff." According to Dobbins, the contract submitted to CCSI by FabArc for the Toray project "was the pretty much standard subcontract between us and them . . . [a]nd there was an attachment and that was their contract with the owner. And I did review both of those documents on this job." Dobbins reviewed the contract between CCSI and FabArc for the Toray project "pretty extensively because it was such a large project." If Dobbins decided there were any changes that needed to be made in the contract he would instruct Stewart, who would then get back with FabArc and negotiate the terms. For the Toray project, according to Stewart's deposition, several people at CCSI participated in drafting a 2-page listing of 19 additions or changes CCSI wanted to make to the contract; that list was attached to the final version of the contract and the contract contained the notation, "CCSI's attachment is hereby made part of this contract."
FabArc argues that because the final version of this contract was "negotiated equally between FabArc and CCSI," and the boilerplate text of the contract represented the same contract the parties had used in the course of their dealings over many years and for numerous projects, the rule of contra proferentem
should not automatically apply. As this Court observed inWestern Sling Cable Co. v. Hamilton, 545 So.2d 29, 32 (Ala. 1989), quoting approvingly from a North Carolina case, the rule of contra proferentem is essentially one of legal effect, of "construction" rather than "interpretation," because it can scarcely be said to be designed to ascertain the intent of the parties. In Western Sling one of the parties urged this Court to adopt an exception to the rule of contra proferentem in those situations "where sophisticated, intelligent business persons who are each represented by legal counsel enter into a contract after an arm's-length negotiation wherein all parties have ample opportunity to negotiate all of the contract's terms. . . ." 545 So.2d at 31. Finding the logic of the proposed exception persuasive, this Court adopted it, stating that "[w]here both parties to a contract are sophisticated business persons advised by counsel and the contract is a product of negotiations at arm's length between the parties, we find no reason to automatically construe ambiguities in the contract against the drafter." 545 So.2d at 32.
Although there is no evidence indicating that either FabArc or CCSI had the advice of counsel in negotiating the particular version of the standard contract they entered into for the Toray project, the record *Page 360 
supports the conclusion that both FabArc and CCSI were sophisticated business entities and the contract between them was the product of arm's-length negotiations. Dobbins testified that he had been in the business of structural-steel erection for 30 years, that he had completed many jobs in conjunction with steel fabricators, and that "in a majority of the work we do, we end up being in a package with the fabricators" because the general contractor on the job did not want to have the steel erection bid and contracted separately from the steel fabrication.
Although the party requesting recognition of an exception to the contra proferentem rule in Western Sling included the element of advice of counsel because that circumstance existed in that case, this Court has not had occasion to consider whether an exception should be recognized where that particular element is not present, but where both parties to the contract are sophisticated business entities, the contract resulting from negotiations at arm's length between the parties is based substantially on one used repetitively by them over many years, and the chief executive of the business seeking to invoke the rule of contra proferentem, equipped with 30 years experience in the industry, closely analyzes the contract, as did Dobbins. Numerous courts from other jurisdictions have concluded that automatic application of the contra proferentem rule is inappropriate where experienced and sophisticated business persons of relatively equal bargaining power have negotiated a contract. See, e.g., Tranzact Techs., Ltd. v. EvergreenPartners, Ltd., 366 F.3d 542 (7th Cir. 2004); County of SanJoaquin v. Workers' Comp. Appeals Bd., 117 Cal.App.4th 1180,12 Cal.Rptr.3d 406 (2004); Tri City Nat'l Bank v. Federal Ins.Co., 268 Wis.2d 785, 674 N.W.2d 617 (Ct.App. 2003); Kozura v.Tulpehocken Area School Dist., 568 Pa. 64, 791 A.2d 1169 (2002);Bristol-Myers Squibb Co. v. United States, 48 Fed. Cl. 350 (2000); Sentinel Prods. Corp. v. Scriptoria, N.V.,124 F.Supp.2d 115 (D.Mass. 2000); Cray Research Inc. v. UnitedStates, 44 Fed. Cl. 327 (1999); Eley v. Boeing Co.,945 F.2d 276 (9th Cir. 1991); Centennial Enters., Inc. v. Mansfield Dev.Co., 193 Colo. 463, 568 P.2d 50 (1977); Consumers Ice Co. v.United States, 201 Ct.Cl. 116, 475 F.2d 1161 (1973); and Spatzv. Nascone, 364 F.Supp. 967 (W.D.Pa. 1973).
We conclude that rule of contra proferentem should not control the resolution of the dispute between FabArc and CCSI concerning the proper interpretation of the allegation provision because of the following unique considerations applicable to this case. The relevant factor our caselaw says should be considered in interpreting an indemnity agreement is the degree of control retained by the indemnitor over the activity alleged to have given rise to the liability on the part of the indemnitee; in this case the degree of control retained by CCSI was total and exclusive. As noted earlier, "the smaller the degree of control retained by the indemnitee [FabArc], the more reasonable it is for the indemnitor [CCSI], who has control, to bear the full burden of responsibility for injuries that occur in that area."City of Montgomery, 534 So.2d at 595.
To apply the rule of contra proferentem in this case would "thwart" the legitimate operation of that rule of construction.Denson and G.F.A. Peanut Ass'n, supra. CCSI committed to indemnify FabArc not only for liability for injury or death arising out of any work or operation performed by CCSI or arising out of CCSI's negligence, but also whenever it was charged or alleged in a claim or lawsuit that CCSI had been in any way at fault in causing or contributing to such injury or death. With respect to the allegation of Cynthia's complaint *Page 361 
that FabArc and "any" of its employees and agents had failed to install supports, anchors, and fasteners, Donald Dobbins acknowledged during his deposition that only CCSI was performing installation work for FabArc and that installation of the angle clips would have been the responsibility of CCSI under its subcontract with FabArc. CCSI assumed the role of being FabArc's "eyes and ears on the job site" and undertook to attend job-site meetings and safety meetings on its behalf.
Although the allegations of Cynthia's complaint were broad enough to cover various scenarios, the charge and allegation that FabArc, through CCSI, negligently or wantonly failed to install proper and adequate angle clips, fits easily within the scenarios included within the complaint. The allegation provision does not require that the only allegation of the primary plaintiff be that of fault on the part of CCSI, just that such a charge or allegation be present, even if accompanied by others. We do not think it reasonable to read Cynthia's allegations so strictly as to assume that she used the word "agents" only in a legalistic and technical sense, so as to exclude a subcontractor. The fact that she was aware of CCSI's involvement as FabArc's sole work crew on the job makes it just as logical to understand her use of the word "agents" in its more generic sense. In his deposition, Heathcock characterized CCSI as "one of our agents."
Accordingly, as applied to Cynthia's allegations, we reject CCSI's argument that the allegation provision could be triggered only by the filing on an action naming it as a defendant; all the provision requires is that there be a charge or allegation of fault on the part of CCSI. It would be inappropriate conclusively to resolve the ambiguity of the allegation provision by the simple expedient of applying the "rule of last resort," thecontra proferentem rule, although the ambiguity is not conclusively resolved by application of other rules of contract interpretation. Because ambiguity remains, a summary judgment as to the meaning and proper application of the allegation provision to the facts of this case was improper:
 "[I]f the trial court finds the contract to be ambiguous, it `must employ established rules of contract construction to resolve the ambiguity.' If the application of such rules is not sufficient to resolve the ambiguity, factual issues arise:
 "`If one must go beyond the four corners of the agreement in construing an ambiguous agreement, the surrounding circumstances, including the practical construction put on the language of the agreement by the parties to the agreement, are controlling in resolving the ambiguity.'
 "Where factual issues arise, the resolution of the ambiguity becomes a task for the jury."
Alfa Life Ins. Corp. v. Johnson, 822 So.2d 400, 404-05 (Ala. 2001) (citations omitted). See also Tucker v. Cullman-JeffersonCounties Gas Dist., 864 So.2d 317 (Ala. 2003); Ex parteMountain Heating Cooling, Inc., 867 So.2d 1112 (Ala. 2003);Ex parte Harris, 837 So.2d 283 (Ala. 2002); and Ex parteConaway, 767 So.2d 1117 (Ala. 2000). "Ambiguity in a contract precludes the trial court from entering a summary judgment" in an action for breach of contract. Whitetail Dev. Corp. v.Nickelson, 689 So.2d 865, 867 (Ala.Civ.App. 1996).
Accordingly, we reverse the summary judgment in favor of CCSI on FabArc's claim for indemnity from CCSI for the amount it incurred to settle Cynthia's claim against it to the extent that judgment involved the allegation provision, and we remand the case for further proceedings *Page 362 
consistent with this opinion in that regard.
Although FabArc makes passing references in its brief to the fact that Shimizu and Great American, in addition to Cynthia, asserted claims against FabArc for its alleged failure to install the angle clips, FabArc focuses its argument on the allegations made by Cynthia, in apparent recognition that her action was the only one "for [the] death" of Evodio Sanchez and that the allegation provision relates only to "such . . . lawsuits . . . where it is charged, alleged or proven that [CCSI] was in anyway at fault in causing or contributing to such . . . death. . . ." FabArc makes no attempt to characterize the cross-claim by Shimizu or the intervention by Great American as a lawsuit "for [the] death" of Evodio Sanchez, and we see no basis for so characterizing those actions. Rather, they are lawsuits for contractual indemnity secondary only to Shimizu's exposure to liability for Evodio's death.
Additionally, FabArc did not claim in its third-party complaint against CCSI or in any of its submissions to the trial court relating to the motions for a summary judgment filed by it and CCSI that indemnity was due from CCSI for any of the various claims and demands under paragraph 5 of the subcontract between FabArc and CCSI. It argued only that the provisions of paragraph 4 provided indemnity. We likewise find no argument in FabArc's briefs to this Court invoking the provisions of paragraph 5 as an independent basis for finding a duty of indemnity on the part of CCSI.
 Failure to Procure Insurance
"Agreements to procure insurance are generally enforceable under Alabama law, and a party who breaches such an agreement is liable for damages resulting from the failure to obtain the promised insurance.
 "A contractual obligation to indemnify is distinct from a contractual obligation to procure insurance. Under an agreement to indemnify, the promisor assumes liability for all injuries and damages upon the occurrence of a contingency. In contrast, an agreement to obtain insurance involves the promisor's agreement to obtain or purchase insurance coverage, regardless of whether [a] contingency occurs."
Goodyear Tire Rubber Co. v. J.M. Tull Metals Co.,629 So.2d 633, 639 (Ala. 1993) (citations omitted).
As noted, in paragraph 4 of the subcontract between FabArc and CCSI, CCSI agreed that FabArc "shall be named as an additional insured in [CCSI's] general comprehensive and public liability policy." Paragraph 3 of the subcontract obliged CCSI "to obtain public and general liability insurance covering . . . personal injury damages . . . for a minimum of $1,000,000/occurrence and $1,000,000/aggregate." Further, CCSI was obligated to "furnish a certificate satisfactory to FabArc for each insurance company showing the required insurance is in force and effect."
FabArc charged in its third-party complaint that CCSI had breached it contractual obligation to name FabArc as an additional insured in CCSI's general comprehensive and public liability policy "by failing to name FabArc Steel as an additional insured without exception(s) under its comprehensive liability policy," with the result that "CCSI's liability insurance carrier, Zurich, has refused to defend and indemnify FabArc Steel without exception(s) in [the Sanchez] lawsuit."
In its principal brief to this Court, FabArc states that it "does not dispute that CCSI provided a certificate of insurance from Zurich listing FabArc and Shimizu as *Page 363 
additional insureds under the Zurich policies; however, CCSI's delivery of an insurance certificate is insufficient to meet the contract requirement that CCSI provide insurance." FabArc has filed a separate action against Zurich in the United States District Court for the Northern District of Alabama, seeking a judgment declaring that FabArc is covered under the Zurich policies in question for the claims brought against FabArc by Cynthia, Shimizu, and Great American, respectively. FabArc advises this Court that on February 10, 2004, the federal district judge handling that case entered "summary judgment in favor of FabArc and found as a matter of law that Zurich owed insurance coverage to FabArc under the primary and excess insurance policies issued to FabArc subcontractor, CCSI. On March 10, 2004, Zurich filed a Notice of Appeal to the Eleventh Circuit." (FabArc's brief, p. 23 n. 3.) FabArc argues that should Zurich ultimately prevail before the United States Court of Appeals for the Eleventh Circuit, then CCSI will have breached its duty to procure the required insurance.
According to FabArc, as summarized in its narrative summary in opposition to CCSI's motion for a summary judgment and in FabArc's brief to this Court, Zurich initially, on June 3, 2000, committed that it would provide FabArc "with a complete defense and indemnification" in the Sanchez action. Eleven days later, however, Zurich changed its position and withdrew its acceptance of defense and indemnification for FabArc, stating instead that FabArc would be accorded "additional insured status but only in an excess capacity." After FabArc filed its declaratory-judgment action in the federal court, Zurich again changed its position, asserting in response to requests for admissions by FabArc that FabArc was not covered under the Zurich policies for the matters in question, not even with respect to excess coverage.
Based on these developments, FabArc argues (1) that the trial court acted prematurely in entering a summary judgment for CCSI with respect to FabArc's claim alleging breach of the contractual duty to procure insurance, pending the outcome of the federal litigation, and (2) that a summary judgment was not warranted on the merits, given the position Zurich has taken concerning FabArc's status under its policy. FabArc has not moved for a summary judgment on this issue in its own behalf, choosing only to oppose the summary judgment sought by CCSI.
FabArc further argues that because the contract between it and Shimizu required that "[a]ll insurance furnished in connection with this project shall provide that it is primary coverage regarding any insurance event" and because under paragraph 5 of the contract between CCSI and FabArc CCSI assumed toward FabArc all of FabArc's obligations toward Shimizu "with respect to" CCSI's work, that CCSI's obligation to FabArc was to provide it with primary coverage. We note further that the record contains Zurich's opposition to a claim for indemnification made on behalf of FabArc by its insurer, in which Zurich asserted that because the indemnity provision in the contract between FabArc and CCSI was not "an insured contract" there was no coverage. Paragraph 4 of the contract between FabArc and CCSI specified that CCSI's "liability insurance policies shall each contain contractual insurance coverage as to the covenant contained in this section," i.e., the indemnification provisions of paragraph 4.
CCSI's position in opposition on this issue is simply that CCSI's only contractual obligation was to name FabArc as an additional insured under its general liability policy and that it is undisputed that FabArc *Page 364 
was so named in CCSI's policy. CCSI argues that it is also undisputed that it provided FabArc with a copy of the certificate of insurance listing FabArc and Shimizu as additional insureds, which FabArc accepted as satisfactory.
With respect to the implications of Zurich's refusal to provide FabArc with coverage, CCSI argues that the outcome of the federal litigation on the issue of coverage "does not affect the merits of the issue of whether CCSI met its contractual insurance obligation to name FabArc as an additional insured."
We conclude that genuine issues of fact remain with respect to whether CCSI was obligated to name FabArc as an additional insured "without exception(s)" under its liability insurance policies, including whether such coverage was to be primary as opposed to only excess. FabArc admitted in its memorandum of law in opposition to CCSI's motion for a summary judgment that if FabArc ultimately prevails against Zurich in its federal declaratory-judgment action, FabArc's claim against CCSI alleging breach of the contractual duty to procure insurance "may be moot." Conversely, FabArc argued that should it not prevail, and the ultimate ruling in the federal declaratory-judgment action be that Zurich provides no coverage to it, then "FabArc's claim against CCSI for failure to provide insurance will be ripe since the complete primary coverage required by the FabArc/CCSI subcontract (which incorporates all the provisions of the Shimizu/FabArc contract) will have been breached by CCSI."
Because CCSI has not carried its burden of demonstrating the absence of any genuine issues of material fact as to this issue, a summary judgment as to the issue was not in order. Accordingly, we reverse the summary judgment entered in favor of CCSI as to this aspect of FabArc's third-party complaint against CCSI and remand the case.
 Conclusion
We affirm the denial of FabArc's motion for summary judgment, there being contractual ambiguities not resolved by applicable rules of contract construction. We reverse the summary judgment for CCSI to the extent it disposed of FabArc's claim for indemnity under the allegation provision as to the Sanchez lawsuit and to the extent it disposed of FabArc's claim alleging breach of contract to procure insurance. As to those aspects of FabArc's third-party claim, unresolved contractual ambiguities preclude a summary judgment. We remand this cause for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
NABERS, C.J., and SEE, STUART, and BOLIN, JJ., concur.